**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**KEY WEST DIVISION**

| | | |
|---|---|---|
| **AZALP LLC,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO._____** |
| | ) | |
| **v.** | ) | |
| | ) | **COMPLAINT** |
| **BRUCE L. SILVERSTEIN, YOUNG** | ) | |
| **CONAWAY STARGATT & TAYLOR, LLP,** | ) | **JURY TRIAL DEMANDED** |
| **PAUL SULLIVAN and P&B FINANCE, LLC,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

TABLE OF CONTENTS

Page

SUMMARY OF THE CASE ............................................................................................ 1

THE PARTIES .............................................................................................................. 4

THE CO-CONSPIRATORS .......................................................................................... 6

JURISDICTION AND VENUE ...................................................................................... 6

FACTUAL ALLEGATIONS ......................................................................................... 7

I.      Birth of a Hoax ........................................................................................ 7

II.     Miscovich Solicits Plaintiffs' Investments and Loans ............................. 8

III.    With Plaintiffs' Funds in Hand, and with the Aid of Silverstein and YCST, Miscovich Tries to Seize Ownership of the Venture and its Assets ......................... 12

IV.     Silverstein and YCST Acquire Undisclosed Interests in Miscovich's Enterprise, then Strip Away the Assets Securing Plaintiffs' Note ......................... 16

V.      Silverstein and YCST Plan and Control the Admiralty Litigation, and Ignore Emerging Evidence of Miscovich's Fraud ................................. 20

VI.     Silverstein Learns that No Salvage Activity Is Occurring at the Alleged Emerald Site ................................................................................ 23

VII.    Guided by Silverstein, JTR Files a Fraudulent Admiralty Claim and Conceals Evidence from the Court .......................................................... 23

        a.      Storm Warnings:  Laboratory Tests Reveal Modern Epoxy on the Emeralds .............................................................................. 25

        b.      Horan Warns Silverstein and Sullivan of Fraud on the Court, and Silverstein Threatens to Sue Him ................................. 29

        c.      The Horan Memorandum Confirms Defendants' Knowledge of More Red Flags of Fraud ................................................. 32

VIII.   Silverstein Threatens Plaintiffs, Lawyers and Witnesses Who Challenge Defendants' Claims .............................................................. 36

IX.     Miscovich and Elchlepp Perpetuate The Fraud Under Oath .................... 39

X.      The Court Rejects Miscovich's Story, and Schedules a Further Trial on Sanctions ................................................................................ 46

XI.     Faced with Evidence of Fraud, JTR's Trial Counsel Seeks to Withdraw, But Silverstein and Sullivan Re-Commit to JTR .............................. 47

XII.    The 2014 Sanctions Trial: JTR Finally Admits to the Fraud; This Time, Silverstein Stays Away ............................................................ 51

XIII.   The Court Finds That "This Entire Case Is Premised on a Fraud." .......... 53

COUNT I (Conspiracy to Defraud) ............................................................................. 54

COUNT II (Aiding and Abetting) ............................................................................... 56

TABLE OF CONTENTS (continued)

COUNT III (Racketeer Influenced and Corrupt Organizations Act - §772.103 Florida Statutes)..................................................................................................................58

The Predicate Acts .........................................................................................................59

    a.    Organized Fraud - §817.034(4)(a) Fla.................................................59

    b.    Communications Fraud  - §817.034(4)(b) Fla.....................................59

    c.    Theft - §812.014(1).............................................................................59

    d.    False Official Statements - §837.06 Fla .............................................60

    e.    Compounding Felony - §843.14 ........................................................60

    f.    Extortion - §836.05 Fla......................................................................60

COUNT IV (Negligent Misrepresentation) ....................................................................62

COUNT V (Federal RICO, 18 U.S.C. §1962 (c)) ..........................................................63

The Enterprise ...............................................................................................................63

Pattern of Racketeering Activity...................................................................................65

Relationship of Pattern of Racketeering Activity to the Enterprise..............................68

COUNT VI (RICO Conspiracy, 18 U.S.C. §1962 (d))..................................................69

ii

Plaintiff AZALP LLC, for itself and as assignee of the rights of DARN LLC, CLAWDB LLC, CEDARWOOD LLC, M VENTURES LLC and Dean Barr, as and for its Complaint against defendants Bruce L. Silverstein ("Silverstein"), Young Conaway Stargatt & Taylor, LLP ("YCST"), Paul Sullivan ("Sullivan") and P&B Finance, LLC (collectively, "Defendants"), alleges and states as follows:

## SUMMARY OF THE CASE

1.      This action arises out of a massive fraud in which a self-described treasure hunter named Jay Miscovich and his co-conspirators (the "Miscovich Group") fabricated the discovery in the Gulf of Mexico of thousands of precious emeralds, supposedly originating from a 17th-century shipwreck, and worth as much as half a billion dollars.  Defendants Silverstein, YCST, Sullivan and P&B Finance, LLC ultimately joined the scheme as legal counsel, investors and equity owners, and used the Federal and State Courts to perpetuate the fraud, conceal the truth and intimidate those who sought to discover and disclose the facts.

2.      Defendants had actual knowledge that Miscovich made false claims about the date he allegedly found the emeralds, false claims that he found coins at the alleged emerald site, false claims that he used a magnetometer to find the site, false claims that he paid a diver for a treasure map, false claims that he paid the diver for a release of salvage rights, and false claims that Proskauer Rose LLP, a New York law firm, prepared the release.  In addition, Defendants learned, among other things, that Miscovich gave perjured testimony about his alleged find in court proceedings; that Miscovich withheld emeralds in violation of a Court Order; that the emeralds were treated with modern epoxy resins; that Miscovich purchased emeralds in bulk from a dealer in Jupiter Florida; that Miscovich's accomplice, Stephen Elchlepp, threatened to injure or kill two witnesses; that attempts were made to injure or kill  those two witnesses soon after the threats were communicated to Defendants;  and that Miscovich threatened in writing to "blow [the]

1

fucking head off" of a lawyer investigating the fraud.   Further, Defendants knew that all the Florida lawyers (from two law firms) who had acted as local counsel to JTR withdrew or attempted to withdraw as counsel because they concluded that JTR's case was fraudulent, and that Miscovich's brother and member of JTR, Scott Miscovich, concluded that the find was a fraud and reported the fraud to the FBI.  Defendants were also aware that the federal judge presiding over JTR's case suggested in open court to the FBI and an Assistant United States Attorney that based on the evidence presented to the Court, it appeared that Silverstein may have committed obstruction of justice and acted as an accessory to criminal fraud.   Notwithstanding knowledge of all of these and other facts showing beyond any doubt that the find and the case were fraudulent, Defendants continued to support and advance the fraud.

3.      The conspirators publicized their "tall tale" of ancient treasure to millions on "60 Minutes" ("The Trouble with Treasure") and used the promise of fabulous riches to extract investments and loans from the Plaintiffs.  JTR Enterprises LLC ("JTR") was formed by YCST to serve as an investment vehicle and to file an admiralty case in the United States District Court for the Southern District of Florida for the purpose of establishing a court-endorsed fraudulent treasure provenance for the emeralds.  For more than three years, JTR and its owners used the judicial system of the United States to perpetuate and conceal the fraud, and committed serial acts of perjury, obstruction of justice and other crimes that are currently the subject of an ongoing federal criminal investigation.   As the fraud began to come to light, Miscovich took his own life in October 2013, but his co-conspirators continued to perpetuate and conceal the fraud.

4.      At the conclusion of a Federal court hearing in January 2014, JTR's trial counsel finally admitted that the alleged find in the Gulf of Mexico was an outright fraud, and that "the scheme to defraud was to represent emeralds of a certain quality as having a higher quality based

on their origin from an antique shipwreck." In later filings, JTR confessed that "[a]s an artifice of Mr. Miscovich's fraud, he sought the blessing of the District Court or its 'seal of approval' and used JTR, and its various attorneys … to further this fraud through the filing of this admiralty claim."  JTR acknowledged that this fraudulent scheme was "outrageous, inexcusable and indefensible."

5.      Defendants were the linchpin to Miscovich's fraudulent corporate and litigation strategy.  Defendants joined the Miscovich Group's conspiracy with knowledge of its general purpose and scope.  Defendants' acts in furtherance of the conspiracy included, *inter alia*, filing false affidavits and other false and misleading documents and statements with the courts; proffering false and perjured testimony; personally vouching for the integrity and truthfulness of the Miscovich Group in affidavits and testimony; threatening at least seven witnesses (including Plaintiffs), who challenged the Miscovich's Group's story, with litigation and sanctions; acquiring undisclosed ownership interests in the fraudulent scheme; frustrating and preventing the recovery of Plaintiffs' funds by transferring all of the enterprise's assets to an entity formed by Defendants; waging a  costly, year-long "scorched earth" litigation campaign to prevent or delay an independent examination of the alleged gemstones; actively withholding evidence of fraud, including evidence of modern chemical enhancements on the stones, from the Court; and continuing their strategy of bad faith litigation, threats and concealment of the truth on behalf of Miscovich Group long after it became evident to many – including JTR's own local Florida counsel -- that the entire enterprise was fraudulent.

6.      On or about May 27, 2014, the Hon. K. Michael Moore, United States District Judge for the Southern District of Florida, held that communications by Miscovich's and JTR's attorneys were not entitled to the protection of the attorney-client privilege because JTR's counsel

3

was employed in furtherance of criminal or fraudulent conduct. This is known as the "crime-fraud" exception to the attorney-client privilege. Pursuant to the crime-fraud exception, many of Defendants' formerly privileged communications have been released, and they form the basis for much of the present Complaint.

7.      On July 25, 2014, Judge James Lawrence King of the United States District Court for the Southern District of Florida issued an Order to Show Cause directing Silverstein, YCST and Paul Sullivan, Silverstein's business partner and fellow investor in JTR, to appear before the Court and show why they should not be sanctioned for bad faith litigation.

8.      As a result of Defendants' participation in the fraud, Plaintiff and Plaintiff's assignors (collectively, "Plaintiffs") not only were lulled into believing that the emerald find was legitimate, but were caused to incur millions of dollars in out-of-pocket expenses, legal fees, forensic costs and disbursements to protect their interests and to investigate, examine and ultimately uncover the fraud. Such damages are not less than $3.4 million, trebled under the Florida and Federal Racketeer Influenced and Corrupt Organizations Acts; plus punitive damages of not less than $10,200,000.

## THE PARTIES

9.      Plaintiff AZALP LLC ("AZALP") is a limited liability company organized under the laws of the State of New York, with its principal place of business in New York. AZALP is the assignee of all rights, title and interest in the claims of the following entities against Defendants herein, pursuant to an Assignment of Claims dated July 21, 2014:

   a.      DARN LLC ("DARN"), a limited liability company organized under the laws of the State of New York, with its principal place of business in New York.

   b.      CLAWDB LLC ("CLAWDB"), a limited liability company organized under the laws of the State of New York, with its principal place of business in New York.

4

c.      Cedarwood LLC ("Cedarwood"), a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York.

d.      M Ventures, LLC ("M Ventures"), a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

e.      Dean Barr ("Barr"), a citizen and resident of the State of Connecticut. Barr is the sole member of Cedarwood.

10.     Upon information and belief, Defendant Bruce L. Silverstein ("Silverstein") is a citizen and resident of the State of Delaware.  Silverstein is an attorney licensed to practice law in the State of Delaware. He is an equity owner of Young Conaway Stargatt & Taylor, LLP and a member of that firm's Management Committee.  At all relevant times, Silverstein acted as outside general counsel to JTR and, through P&B Finance LLC, was an equity owner of JTR. Upon information and belief, Silverstein invested not less than $100,000 of his personal funds in JTR.

11.     Upon information and belief, Defendant Young Conaway Stargatt & Taylor, LLP ("YCST") is a Delaware limited liability partnership engaged in the practice of law.  At all relevant times, YCST acted as outside general counsel to JTR and Miscovich and, in addition, held an undisclosed option to acquire a 5% equity interest in JTR.

12.     Upon information and belief, Defendant Paul Sullivan ("Sullivan") is a citizen and a resident of the State of Hawaii. At all relevant times, Sullivan was a member of JTR's three-person advisory board and, through P&B Finance LLC, was an equity owner of JTR.

13.     Upon information and belief, Defendant P&B Finance, LLC ("P&B") is a limited liability company organized under the laws of Delaware, with its principal place of business c/o

5

YCST in Wilmington, Delaware. Upon information and belief, the members of P&B are Silverstein and Sullivan. At all relevant times, P&B owned an equity interest in JTR.

## THE CO-CONSPIRATORS

14.     Upon information and belief, until his death by suicide in October 2013, Jay E. Miscovich ("Miscovich") was a citizen of the Commonwealth of Pennsylvania.

15.     Upon information and belief, Scott Miscovich ("Scott Miscovich") is a citizen and resident of the State of Hawaii.  Scott Miscovich is a brother of Miscovich.

16.     Upon information and belief, Peter Tobia ("Tobia") is a citizen and resident of the State of New Jersey.

17.     Upon information and belief, Stephen Elchlepp, Jr. ("Elchlepp") is a citizen and resident of the State of Florida.

18.     Upon information and belief, Scott Heimdahl ("Heimdahl") is a citizen and a resident of the State of Illinois.

19.     Upon information and belief, Anthony Santelli ("Santelli") is a citizen and a resident of the State of Ohio.

20.     Upon information and belief, JTR is a limited liability company organized under the laws of Delaware.  JTR's registered agent in Delaware is YCST.

21.     Upon information and belief, Emerald Reef, LLC ("Emerald Reef") is a limited liability company organized under the laws of Delaware.

## JURISDICTION AND VENUE

22.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States, as well as supplemental jurisdiction under 28 U.S.C. §1367(a).

6

23.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that complete diversity of citizenship exists between the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of costs.

24.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events or omissions giving rise to this action arose in this District, and Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### I.     Birth of a Hoax

25.     In late 2009 or early 2010, Miscovich, an insolvent and unemployed real estate speculator, hatched a plan to fabricate a unique find of huge quantities of Spanish colonial-era emeralds in the Gulf of Mexico, and to use the resulting publicity to attract investors lured by the promise of genuine sunken treasure and a highly lucrative salvage enterprise. Knowing that the value of the "find" would increase dramatically if the provenance of the gems were linked to an exciting story of an ancient shipwreck, Miscovich concocted a tale of buying a treasure map in a seaside bar for $500 from a mysterious diver who demanded secrecy, a Spanish colonial pottery shard, and the possibility of a 17th-century Spanish galleon lying off Key West.

26.     Together with his initial co-conspirators Tobia, Heimdahl, Santelli  and Elchlepp, Miscovich  launched the treasure scam in or about April 2010 by purchasing bulk quantities of low-grade emeralds from a gem dealer in Jupiter, Florida.  Miscovich initially used $60,000 from Santelli and RS Operations, Inc. (an entity controlled by Heimdahl and/or Tobia) as the initial funding to purchase the emeralds.  Miscovich later used the proceeds from the Plaintiffs' investments to make additional emerald purchases from the gem dealer. Miscovich ultimately made at least four trips to the gem dealer, paying a total of $80,000 in cash for about eighty pounds of emeralds and other stones.  Miscovich demanded that the dealer keep no records of the

transactions. To underscore the point, Miscovich even threatened the lives of the gem dealer and his family if his purchases were disclosed.

27.    Miscovich needed to manufacture a credible cover story to explain his "discovery" and create a lucrative provenance for the emeralds. According to Miscovich's testimony in an admiralty trial in December 2012, he met an acquaintance named Mike Cunningham at a bar in Key West, Florida on January 8, 2010 and paid him $500 in cash for a treasure map and piece of Spanish colonial pottery purportedly found at the site marked in the map. Miscovich claimed that on January 11, 2010, with the aid of the treasure map, he and Elchlepp dove in the Gulf of Mexico and discovered thousands of emeralds scattered across the sea floor.

28.    To assist in attracting investors and to portray the enterprise as legitimate and respectable, Miscovich enlisted the help of his brother, Scott Miscovich, a physician living in Hawaii.

## II.    Miscovich Solicits Plaintiffs' Investments and Loans

29.    In or about March, 2010, Scott Miscovich contacted Barr, an old college friend and former hedge fund executive.  Scott Miscovich described the spectacular emerald find in the Gulf of Mexico, the treasure map, and the pottery shard.  Barr agreed to meet with Miscovich in New York City.

30.    On April 8, 2010, Barr met with Miscovich in New York City at the office of Ivan Taback ("Taback"), a partner in the law firm of Proskauer Rose LLP ("Proskauer").  At the meeting, Miscovich showed Barr and Taback samples of the emeralds that he claimed to have recovered from the Gulf of Mexico.   Miscovich described his meeting in a bar in Key West and his purchase of the map and the pottery shard for $500 from a diver.  Miscovich told Barr that the pottery shard was found on the emerald site, and explained that the shard proved that the emeralds

8

came from a Spanish colonial shipwreck – a provenance that would increase the value of the emeralds many times.  Miscovich also advised that he had obtained a release from the diver.

31.     Around this same time, Miscovich purchased approximately twenty pounds of emeralds from the gem dealer in Florida, while Tobia waited in a nearby McDonald's restaurant. Miscovich and Tobia then took the newly-purchased stones to Barr's home in West Palm Beach, Florida.   Miscovich and Tobia told Barr that the emeralds had been salvaged by Miscovich and Elchlepp from the Gulf of Mexico site with the aid of the treasure map.

32.     On or about April 15, 2010 Miscovich, Barr and Taback met again at Proskauer's office in New York City.    This time, Miscovich brought a photocopy of a hand-drawn map. Miscovich stated that a shipwreck provenance for the emerald find was highly likely.  After seeing the map, and believing that  Miscovich had in fact made a significant find of emeralds originating from an ancient wreck, Barr  agreed to invest in the salvage operation.

33.     At Miscovich's request, Barr paid a $50,000 retainer to engage Proskauer for purposes of creating an entity to raise funds and conduct a salvage operation in the Gulf of Mexico, and to search for further evidence of a shipwreck. On or about April 19, 2010, Proskauer formed Emerald Reef LLC ("Emerald Reef").

34.     Shortly thereafter, Barr sought the assistance of the accounting firm of Ash & Parsont, LLP to provide tax and accounting services to Emerald Reef.  Upon hearing Miscovich's story of the map, the pottery shard, and the emerald discovery in the Gulf of Mexico, and after seeing some of the emeralds Miscovich claimed to have discovered, Neil Ash ("Ash"), a principal of Ash & Parsont, LLP, formed AZALP, CLAWDB and DARN for the purpose of investing in the enterprise.

35.    Bruce J. Mactas ("Mactas"), a financial services professional, decided to participate in the venture after attending meetings with Fleishman Hillard, a public relations firm hired by Miscovich, and seeing some of the emeralds that Miscovich claimed to have discovered. Mactas invested through M Ventures LLC.

36.    On or about June 2, 2010, Miscovich instructed Proskauer to form an entity known as Salvage Boat Leasing LLC ("SBL"). The purpose of SBL was to own and operate salvage equipment and a 115-foot boat called THE GLOBAL EXPLORER.  SBL was primarily funded with a personal loan of $350,000 from Ash and a bank loan of $350,000 which was personally guaranteed by Barr, for a total of $700,000.

37.    A substantial portion of the funds provided by Plaintiffs to Emerald Reef was used to pay Miscovich's personal debts and living expenses.  Miscovich sought weekly advances of $10,000 or so, claiming that he desperately needed cash to survive and that his personal indebtedness, if left unresolved, would foster negative publicity and adversely affect the success of the treasure salvage venture.

38.    On or about June 2, 2010, Miscovich caused Proskauer to form an entity known as Global Underwater Treasure Salvage LLC ("GUTS").  On July 28, 2010, GUTS contracted with the Kirby Group, LLC for an exclusive license to carry out salvage operations on a known shipwreck site in Florida near Woman and Ballast Keys (the "Kirby Site").  The license fee of $100,000 paid by GUTS was funded with a loan from Emerald Reef, whose funds were in turn provided by Plaintiffs.  Unknown to Plaintiffs, the true purpose of GUTS was to find artifacts from documented shipwrecks at a known wreck site (*e.g.*, cannon balls), and then to fraudulently claim that such artifacts were actually found at the alleged emerald site so as to "evidence" a shipwreck at the emerald site.

10

39.     During the summer and fall of 2010, employees of Emerald Reef, working on behalf of GUTS, explored the Kirby Site and recovered several shipwreck-related artifacts, including cannonballs. These activities were paid for by Emerald Reef, which in turn was funded by Plaintiffs. During this same period, Miscovich also began purchasing shipwreck artifacts, including a cannon.

40.     On July 13, 2010, Barr, Miscovich, and others met with Jeffrey Post, a geologist and curator in charge of the National Gem and Mineral Collection of the Smithsonian Institution in Washington, D.C.  Miscovich presented for inspection a selection of emeralds he claimed to have discovered, along with several shipwreck artifacts, such as coins and cannon balls.  Miscovich told Barr and Jeffrey Post that some of the ship artifacts had been found at the emerald site. In fact, Miscovich either recovered these items from the Kirby Site or purchased the artifacts on the Internet.

41.     Miscovich lied about the origins of the ship artifacts in order to enhance the perceived value of the emeralds and to attract further investments and loans from Plaintiffs and others.

42.     In an email to Ash in August, 2010, Miscovich represented that he had made "an awesome find" and that "iam [sic] very well educated and have one of the highest iqs of your clients…I think I have the smallest ego of anybody around...i don't care about fame…or the legacy…im going to give a very large amount of my share away…i want to be the greatest treasure hunter of all times…**and make my investors very wealthy**." (emphasis added; ellipses and grammar in original)

43.     Between April 2010 and January 2011, in reliance on the Miscovich Group's representations and conduct, including the acts and statements set forth above, Plaintiffs

11

collectively invested or loaned over $1.6 million with Emerald Reef and Miscovich.  The funds were transmitted by Plaintiffs through the use of interstate wire transfers and other means and instrumentalities of interstate commerce.

### III.    With Plaintiffs' Funds in Hand, and with the Aid of Silverstein and YCST, Miscovich Tries to Seize Ownership of the Venture and its Assets

44.     During the spring and summer of 2010, after Plaintiffs had contributed hundreds of thousands of dollars to the salvage enterprise, disputes arose among the parties with respect to the ownership and control of Emerald Reef.

45.     Although Miscovich, Barr and Ash had signed a memorandum confirming their agreement regarding investment amounts and ownership interests in Emerald Reef in September 2010, Miscovich subsequently tried to repudiate the agreement and take complete control over the funds, the salvaged emeralds and other assets of Emerald Reef.

46.     Still believing that Emerald Reef was a highly valuable venture and that their investment was being hijacked by Miscovich, in early January, 2011, Plaintiffs commenced litigation in the Chancery Court of Delaware against Miscovich, Scott Miscovich and Elchlepp, alleging breach of fiduciary duty, breach of contract, mismanagement, and waste of assets.

47.     On or about January 18, 2011, Miscovich retained Silverstein and YCST to defend the Delaware action and to strip Plaintiffs of their ownership interests in Emerald Reef.

48.     In the course of the Delaware litigation, Silverstein and YCST filed with the Court, on behalf of Miscovich, Scott Miscovich and Elchlepp, affidavits and other submissions that, unknown to Plaintiffs, were materially false and misleading. While the Delaware court file is currently still under seal, Miscovich and his counsel repeatedly affirmed the truth of Miscovich's story of the emerald discovery and vouched for the honesty and integrity of Miscovich and his co-conspirators, while accusing Plaintiffs of theft, fraud and greed. In a later case, Silverstein quoted

his own statement in the Delaware case as follows: "If Jay, Scott and Steve [Elchlepp] are successful in their endeavors, *their story will show them to be honest, moral, hard-working individuals* who do not remotely resemble the portrait painted by the reckless and slanderous allegations in Plaintiffs' pleadings." (emphasis added)

49.     Silverstein and YCST also employed "hardball" litigation tactics in the Delaware litigation that far exceeded the bounds of proper advocacy and were intended to make the litigation as expensive and protracted as possible for Plaintiffs.   Among other things, at the onset of the litigation, Silverstein threatened to sue Plaintiffs' attorneys, Willkie Farr & Gallagher LLP; demanded sanctions against Plaintiffs; and falsely asserted, in filings with the Court, that Barr was the subject of an ongoing SEC investigation; and that Miscovich had filed a criminal complaint with the New York City Police Department charging that Ash had stolen some emeralds. Nevertheless, Plaintiffs relied on the allegations in Silverstein's and YCST's court filings that Miscovich had made a fabulously valuable discovery in the Gulf of Mexico, and continued to believe that Emerald Reef held significant assets, including thousands of salvaged gems and the GPS coordinates of the alleged emerald site. In reliance on Defendants' representations, Plaintiffs continued to fund the Delaware litigation in order to protect their rights and to preserve what they believed to be equity interests in a highly lucrative enterprise. Had Plaintiffs known that Emerald Reef was a fraudulent and worthless scheme, they would not have commenced and continued the Delaware litigation and been subjected to the "scorched earth" litigation tactics of Silverstein and YCST. Plaintiffs' costs incurred in connection with the Delaware litigation and related matters were not less than $1,700,000.

50.     On March 2, 2011, the parties agreed to submit their dispute to mediation before Layn Phillips, a former U.S. Attorney and Federal Judge. On March 29, 2011, the parties reached

agreement on the terms of a settlement. The terms were memorialized in a written "Memorandum of Understanding" ("MOU") executed by counsel for the parties on March 29, 2011.  The MOU was prepared by YCST and signed by Silverstein on behalf of Miscovich, Elchlepp and Scott Miscovich.  A court hearing to approve the settlement was scheduled for August 19, 2011.

51.     Pursuant to the MOU, Plaintiffs were to receive a $5,000,000 nonrecourse promissory note (the "Note") from Miscovich, Scott Miscovich and Elchlepp.   The Note was secured by (i) 20% of the proceeds of sales of the emeralds; (ii) 20% of any new investments or financing of Emerald Reef, GUTS, SLB, and another  Miscovich entity, JEM ER, LLC ("JEM"); and (iii) one-third of the emeralds held in a safe deposit box at Citibank in New York.  The Note was non-interest bearing and matured in eighteen months.

52.     The MOU contained a number of material representations and warranties. Among other things, Miscovich, Scott Miscovich and Elchlepp (referred to in the MOU as the "Defendant Group")  represented and warranted to Plaintiffs that:

> Each member of the Defendant Group shall and hereby does represent and warrant that all emeralds or other assets at the locations expressly identified in paragraph 3 of this MOU [*i.e.*, various safety deposit boxes and other specified locations] *were salvaged from the Emerald Reef Site and not any other location*....
>
> Each member of the Defendant Group shall and hereby does represent and warrant that *they believe that one-third of the contents of the Citibank safe deposit box has a minimum retail value of $5 million* as would be evidenced by independent GAL appraisal certifications…. (emphasis added)

53.     Miscovich, Scott Miscovich and Elchlepp further agreed in the MOU that "these representations and warranties shall survive the settlement and the mutual releases exchanged in the settlement shall not destroy any claim for breach of these representations and warranties."

54.     Plaintiffs relied on the representations in the MOU in accepting the settlement and the $5 million Note from Miscovich, Scott Miscovich and Elchlepp.

55.     In consideration of the Note, the security interests, and the representations and warranties of Miscovich, Scott Miscovich and Elchlepp, Plaintiffs agreed to relinquish their interests in Emerald Reef and to provide broad releases to Miscovich, Scott Miscovich, Elchlepp, Sullivan "and each of their respective agents…[and] attorneys…."

56.     The parties agreed that the settlement embodied in the MOU would be submitted for approval at a hearing in the Delaware Chancery Court on August 19, 2011.

57.     One month after executing the MOU, Silverstein filed a motion in the Delaware court on behalf of  Miscovich, Scott Miscovich and Elchlepp, seeking to compel Plaintiffs to grant additional general releases to Tobia, Oceanic Research and Recovery, Inc. ("ORRV") (a penny-stock company purportedly engaged in the treasure salvage business), and Heimdahl, ORRV's principal.  In addition, Silverstein demanded that Plaintiffs be ordered to pay Miscovich's legal fees to YCST. Silverstein claimed that the exclusion of Tobia, ORRV and Heimdahl from the MOU and the releases was due to a mere "drafting error."  However, none of those parties was a party to the Delaware litigation or the mediation, nor had they been mentioned in the course of the proceedings.  The Court denied Silverstein's motion.

58.     Upon information and belief, Tobia was a consultant and "head of investor relations" of ORRV. On April 23 and 30, 2010, ORRV issued 25,000,000 shares of stock to Miscovich in exchange for an interest in Miscovich's emerald venture. ORRV and its subsidiary, RS Operations, also wired funds to Miscovich from time to time. Upon information and belief, Tobia informed Heimdahl of the true (and illegitimate) source of the emeralds.

59.     Upon information and belief, Miscovich instructed Silverstein to demand the releases of ORRV, Heimdahl and Tobia because of concerns regarding Tobia, ORRV's and Heimdahl's knowledge of, and participation in, the ongoing fraud.

Active 22633414v2

### IV.    Silverstein and YCST Acquire Undisclosed Interests in Miscovich's Enterprise, then Strip Away the Assets Securing Plaintiffs' Note

60.    Between the execution of the MOU on March 29, 2010 and the court hearing on August 19, 2010, Silverstein and YCST secretly orchestrated a series of transactions designed to frustrate the purpose of the MOU, to enrich themselves, to render the Note worthless and to deprive Plaintiffs of the material benefits of the settlement.

61.    First, Silverstein took steps to ensure that he would personally benefit from the treasure scam. On or about July 27, 2011, YCST formed an entity known as P&B Finance LLC ("P&B Finance") for the purpose of taking an undisclosed equity interest in JTR, a newly formed entity.  The sole members of P&B Finance were Silverstein and Sullivan. Upon information and belief, Silverstein ultimately used P&B Finance to invest $100,000 of his own funds in JTR.

62.    Upon information and belief, Silverstein's acquisition of an ownership interest in JTR violated professional ethics rules prohibiting lawyers from taking a financial interest in the subject matter of ongoing litigation.

63.    On or about August 11, 2011, just days before the Delaware court hearing to approve the MOU settlement, YCST formed JTR.  The initial members of JTR were Miscovich, Scott Miscovich, Elchlepp, Greg Miscovich (the third and last Miscovich brother), Sullivan, David Paul Horan, Esq., P&B Finance, Mike Vesley and Stephen Elchlepp, Sr.

64.    The registered agent for both JTR and P&B Finance was YCST Services Corporation, located at the offices of YCST in Wilmington, Delaware.

65.    The Operating Agreement of JTR, dated as of August 25, 2011 (the "JTR Operating Agreement"), also drafted by YCST, granted YCST an option to acquire 5% of the ownership units of JTR in "partial satisfaction" of legal invoices.  This option allowed YCST to profit from emerald sales, investments in JTR, as well as the proceeds of any future treasure

16

salvage project.  Upon information and belief, YCST ultimately ran up legal fees in excess of $1.6 million which it expected to collect from the emerald scheme.

66.      The JTR Operating Agreement recited that "Jay Miscovich has discovered uncut emeralds, amethyst and quartz crystals on the sand beneath international waters (such location and the surrounding area being referred to herein as the 'Treasure Reef Site')."   The Operating Agreement defined the "Treasure" as "the entirety of whatever valuable items have been discovered or may be discovered at or about the Treasure Reef Site."

67.      Under the JTR Operating Agreement,  Miscovich, Scott Miscovich and Elchlepp transferred "all right title and interest they may possess regarding the Treasure…including but not limited to their knowledge of the GPS coordinates of the Treasure Reef Site, all items of Treasure Miscovich, Scott Miscovich and  Elchlepp and others working with or for them have taken from the site of the Treasure Reef Site and all items of Treasure Miscovich, Scott Miscovich and Elchlepp and others working with or for them may take from the Treasure Reef Site in the future…."  Silverstein later admitted, in a September 18, 2012, email to JTR's Florida counsel, that the conveyance of the emeralds to JTR violated the terms of the MOU.

68.      Thus, in one stroke, Silverstein and YCST entirely stripped away the very assets and business that were the subject of the MOU and which secured Plaintiff's $5,000,000 Note. At the same time, by diverting the business, operations and assets of Emerald Reef to another entity without any notice or disclosure to Plaintiffs or the Court, Silverstein and YCST rendered worthless that portion of the MOU that entitled Plaintiffs to 20% of any additional funding or capitalization of Emerald Reef, GUTS, SBL or JEM, as such funding or investment to the now-shell entities was not remotely likely in the absence of any assets.

Active 22633414v2

69.      In the September 18, 2012 email, Silverstein admitted that the emeralds were conveyed to a "new entity" (JTR) to shield them from claims of creditors of both Emerald Reef and Jay Miscovich.  With a new entity in place, Silverstein explained, the enterprise would have a "fresh start" free of claims of creditors, such as the Plaintiffs.

70.      Silverstein's activities and designs included the formation of another entity, known as J&S Keys LLC ("J&S Keys"), which was created by YCST on June 27, 2011. Silverstein negotiated an agreement with the Kirby Group granting J&S Keys exclusive salvage rights to a site that previously had been exclusively licensed to GUTS for a fee funded by Plaintiffs.

71.      By forming J&S Keys and arranging for exclusive rights to the Kirby Site, Defendants deprived GUTS of its principal asset – the right to explore the Kirby Site – thus rendering any future financing or capital infusion of GUTS highly unlikely, and further impairing and diminishing Plaintiffs' security interest granted in the MOU signed by Silverstein.

72.      Defendants did not disclose, to the Delaware Chancery Court or Plaintiffs, (i) the formation of JTR, J&S Keys or P&B Finance by YCST, (ii) the diversion of all of the emerald assets  to JTR, (iii) the takeover by J&S Keys of GUTS's salvage rights to the Kirby Site, (iv) Silverstein's acquisition of a personal equity interest in JTR (through P&B Finance) and in the emerald site that was the subject of the litigation, or (v) YCST's contingent equity interest in JTR.

73.      The settlement embodied in the MOU was approved by the Chancery Court on August 19, 2011, without the Court's or Plaintiffs' knowledge of any of the foregoing facts.

74.      On or about August 24, 2011, Defendants delivered the $5 million Note to Plaintiffs.  The Note was drafted by YCST.  The makers of the Note were Miscovich, Scott Miscovich, and Elchlepp.  The Note made no mention of JTR, P&B or J&S Keys.  As a result of

18

the deceptive transactions orchestrated by Silverstein and YCST, the Note was virtually worthless when it was delivered to Plaintiffs, but Plaintiffs were not aware of that fact.

75.     Plaintiffs discovered the "bait and switch" only in September 2011 when JTR filed an *in rem* proceeding, seeking a salvage award for the alleged emerald discovery, in the United States District Court for the Southern District of Florida. On October 14, 2011, still believing that Miscovich and Elchlepp had discovered an enormous cache of emeralds in the Gulf of Mexico, Plaintiffs served Miscovich and Elchlepp with written notice of default under the Note and filed a claim in the admiralty case.

76.     In response to Plaintiffs' efforts to enforce their interests under the MOU, Silverstein proposed that JTR make a "scorched earth" response: "We should give some thought about commencing a suit in DE [Delaware] against the Barr Group…I envision a few pages of background allegations that paint the Barr Group as scurrilous thieves who tried to steal Jay's treasure through slick wall street maneuvers." In other words, if Plaintiffs did not give up their rights under the MOU, Silverstein would use the Delaware courts to publicly smear them.

77.     Plaintiffs' claim was partially settled on or about January 25, 2012 by JTR providing a new $5 million note to Plaintiffs under terms identical to the original Note.   No releases were exchanged.   At the time of this settlement, it was represented, and Plaintiffs still believed, that Miscovich's alleged emerald find was genuine.

78.     Once the dispute over the MOU was resolved, Silverstein lost no time in seeking more money from Plaintiffs for JTR. On or about on February 21, 2012, Silverstein met with Ash at Michael Jordan's restaurant in New York City, and solicited Ash for an additional investment. In an effort to persuade Ash that a new investment would be well managed by JTR, Silverstein boasted that he "controlled" Miscovich and JTR.   Silverstein did not disclose to Ash (or to Ash's

counsel) several material facts known to Silverstein — that multiple laboratories had found epoxy resin on emeralds tested, that Miscovich had "held back" thousands of treated emeralds in violation of a court order, that Miscovich had made false statements concerning the alleged find, and that JTR's Florida attorney, David Paul Horan, suspected that the site had been seeded with emeralds.

79.     The following day, February 22, 2012, Ash, his counsel, and an emerald expert retained by Plaintiffs, Antoinette Matlins, along with Silverstein, Miscovich, and a CBS film crew examined a portion of the emeralds at YCST's New York office.  Matlins referred to the emeralds as "aquarium gravel" and concluded that the emeralds were very low quality and that none of the emeralds were "gem" quality stones.  Matlins' assessment was communicated to Silverstein that day.  Based on this information from Matlins, Ash declined Silverstein's solicitation and any investment in JTR.

80.     Sullivan testified at a January, 2014 sanctions trial in the admiralty case that it was Silverstein's idea to solicit investments from the Plaintiffs:  "Bruce said I got an idea to raise some money, why don't we go back to the New York guys.  I said Jay will never agree to that.  So, we got Jay to agree…"

## V.      Silverstein and YCST Plan and Control the Admiralty Litigation, and Ignore Emerging Evidence of Miscovich's Fraud

81.     Shortly after retaining Silverstein and YCST, Defendants retained David Paul Horan ("Horan"), an experienced and well-regarded admiralty attorney in Key West, Florida, for purposes of commencing a proceeding to obtain legal title for JTR and to acquire a court-endorsed treasure provenance for Miscovich's "find."  Upon information and belief, Defendants commenced the *in rem* proceeding in hopes that no other claims to the alleged emerald site would be made and

20

the judicial approval of their ownership would lend credibility to their allegations of the emeralds' provenance, thus greatly enhancing their value in the marketplace.

82. Prior to accepting representation of JTR, Horan insisted on diving the site to check the veracity of JTR's claim. Though Horan did agree to represent JTR, his observations during this dive raised questions about the claim. As Horan later explained in an email to Sullivan on August 30, 2012: "I was told that a borrowed magnetometer was used to locate the 'emerald patch.' On my first dive, Jay and Steve disclaimed any prior knowledge that the Luchenbach shipwreck was less than 200 feet away from the emerald patch. I could only conclude that the mag was not working properly." Further, Horan wrote that "when I dove the site with Jay and Steve … I found emeralds and amethysts, but always where I was directed." When Horan later dove the site with the "60 Minutes" crew, he found a "large 24.5 K emerald" that was "on the surface of the sand/mud (in the middle of a round hole in a steel beam)." Horan reported these observations and his suspicions to Sullivan and Silverstein.

83. It was expressly understood that Silverstein was in charge of the Florida litigation. Horan's retainer agreement with JTR was drafted by YCST and provided that Silverstein was JTR's "general outside counsel." The retainer agreement required Horan to promptly notify Silverstein of all "material developments" and to consult with Silverstein with respect to "any material decisions" and filings. Furthermore, Horan agreed to "seek specific authorization from Client's general counsel [*i.e.*, Silverstein] before filing any action, entering into any settlement negotiations or agreements or retaining any experts or additional counsel."

84. Throughout the admiralty litigation, Silverstein exercised his authority over all key litigation decisions and filings. Among other things, Silverstein drafted and extensively revised motion papers; insisted on reviewing, commenting on and consenting to all filings in the

admiralty case; drafted, reviewed and edited Status Reports filed with the Court; approved communications with opposing counsel; and drafted responses to motions.  During the 2014 trial, JTR's Florida counsel confirmed that there was "no doubt" Silverstein and his firm represented JTR and Miscovich in the litigation and that they were actively involved throughout the case.

85.     Because Silverstein maintained day-to-day oversight and control of the litigation, JTR's Florida counsel repeatedly asked Silverstein to enter an appearance in the case *pro hac vice*. On May 17, 2012, Florida counsel prepared an application for admission *pro hac vice* for Silverstein to endorse.   Perhaps mindful of counsel's duties of candor to the Court and Rule 11 obligations, Silverstein refused to enter an appearance in the case, claiming in a May 17, 2012 email that "I don't have time to study the [local] rules…."

86.      After JTR hired Horan, Horan warned Miscovich  and the entire JTR group that the government of Spain would likely intervene in the action and make a claim to the emeralds: "Spain will realize we have limited resources," Horan wrote on August 18, 2011, "and will use procedure to try to break us…there will be nothing easy about it."  Thereafter, in a desperate effort to create the impression that the emeralds actually came from an ancient pirate ship (thereby pre-empting a claim by Spain), Miscovich purchased dozens of 17th-century non-Spanish coins and brought them to Horan's office.  Miscovich and Elchlepp told Horan that the purchased coins had been discovered on the emerald site, and that these coins proved that the gemstones came from a pirate ship, not a Spanish sovereign vessel.

87.     When Horan challenged Miscovich and Elchlepp, they admitted that the story about discovering the coins at the emerald site was a lie.

88.     Horan subsequently informed Sullivan and Silverstein that Miscovich and Elchlepp had lied about finding coins on the emerald site. Silverstein and Sullivan did not

investigate further and instead continued to advocate aggressively for themselves, JTR, Miscovich and Elchlepp.

## VI.    Silverstein Learns that No Salvage Activity Is Occurring at the Alleged Emerald Site

89.     Despite having claimed that they found dozens of emeralds every time they dove the site, Defendants, in fact, did not actually work the alleged emerald site at all (other than staged dives to find planted emeralds, one to fool Horan and the other to fool "60 Minutes").  During the 2011 dive season, JTR expended its resources (and Plaintiffs' funds) working the Kirby Site, while Miscovich also used funds from the investors to pay for prostitutes and other unauthorized personal expenses.  Upon information and belief, Defendants were searching the Kirby Site for shipwreck artifacts that they could attribute to the emerald site as evidence of a shipwreck.

90.     Silverstein knew that JTR was ignoring the alleged emerald site.  Silverstein's son, Nolan Silverstein ("Nolan"), lived with Miscovich and Elchlepp in Key West during the summer of 2011, ostensibly to assist with the salvage work at the emerald site.  However, there was no salvage activity being conducted at the alleged emerald site, and Nolan spent that summer on the streets of Key West, dressed like a banana and playing his guitar for loose change.  Upon information and belief, when Silverstein learned of the situation, he flew to Key West and saw for himself that no salvage activity was taking place.

## VII.    Guided by Silverstein, JTR Files a Fraudulent Admiralty Claim and Conceals Evidence from the Court

91.     On September 9, 2011, JTR filed an *in rem* action in the United States District Court for the Southern District of Florida, seeking a "full and final" salvage award or, in the alternative, an award of title to the emeralds to JTR under the American Law of Finds.

92.     The standard procedure for admiralty cases is for the alleged salvors to bring the subject material into the custody of the court to establish *in rem* jurisdiction over the material.

Despite assurances and representations to the Court that the emeralds would be brought into the jurisdiction of the Southern District of Florida, Defendants delayed doing so for a year.  The Court later called the Defendants' actions "a marked departure from this Court's prior and well-established procedures."

93.     One reason JTR did not submit all of the emeralds to the Court's jurisdiction, in violation of the Court's Substitute Custodian Order, was that JTR wanted to shield a portion of the emeralds from claims that could be asserted in the admiralty case.  As Horan later explained in his August 30, 2012 email to Sullivan, after "assisting Jay in depositing all of the recoveries into the bank vault (except the NY emeralds), Jay and Steve show up with a large clear plastic bag containing thousands of small (very green) emeralds that they explained that they had been 'holding back,' until the case looked like it would be won."   Horan had previously reported this episode to both Silverstein and Sullivan.

94.     On October 16, 2011, Motivation, Inc. ("Motivation") filed a claim in the *in rem* proceeding.  Motivation is the judicially-established owner of all salvage rights to the wrecks of the *Atocha* and the *Santa Margarita*, Spanish treasure ships that were originally discovered and explored by Mel Fisher in the 1970's. Motivation alleged that the emeralds came from the area comprising the *Atocha* site, which included the putative debris trail of the *Atocha*, to which Motivation has exclusive rights.

95.     Motivation sought an inspection of the emeralds in order to determine whether, based on the known characteristics of emeralds recovered from the *Atocha* and *Santa Margarita*, the stones could have come from the *Atocha or Margarita*.  Motivation promised to withdraw its claim if the emeralds were not consistent with *Atocha/Margarita* emeralds.   JTR's admiralty counsel, Horan, was familiar with *Atocha/Margarita* emeralds, had seen Miscovich's emeralds,

24

and knew Motivation's emerald expert to be knowledgeable and trustworthy. Horan knew that an inspection by this expert would show that the emeralds were not *Atocha/Margarita* type emeralds and that Motivation would withdraw its claim if allowed to examine the emeralds.   Horan, therefore, strongly recommended that Motivation be allowed to examine the emeralds.

96.     Silverstein and Sullivan rejected Horan's advice, refused to allow any examination, and chose instead to file a motion to dismiss Motivation's claim and wage a year-long, scorched-earth litigation battle to prevent Motivation from examining the emeralds.

97.     On October 18, 2011, JTR filed with the Court the report of R. Duncan Mathewson, III ("Mathewson"), described in the report as a "Historic Shipwreck Archeologist." Mathewson's Executive Summary indicated that Miscovich had "organized an underwater survey of possible shipwrecks" north of the Florida Keys and "while diving with his crew" found emeralds on the sea floor. The report stated further that "The quality and quantity of both the Muzo and Chivor emeralds determined independently by two independent scientific analyses argues for an approximate tentative date for this site as falling within the temporal range of 1570-1700."  The report stated further: "This site could very well represent pirate cargos captured from Spanish, English, or Dutch privateers…" and that there was no evidence that the emeralds were found at the site of a Spanish "treasure fleet" wreck.

   a.     **Storm Warnings:  Laboratory Tests Reveal Modern Epoxy on the Emeralds.**

98.     On December 1, 2011, Sullivan and Silverstein learned of laboratory test results showing that the emeralds were coated with modern-day epoxy resins, which refuted any claim that the stones had lain in the sea for centuries.  The same day, JTR filed a Motion for Judgment on the Pleadings seeking dismissal of Motivation's claim on a legal theory that JTR's emeralds were found outside of Motivation's salvage sites.

25

99.     Silverstein was well aware that the laboratory test results raised grave concerns regarding Miscovich's veracity, and admitted in a December 8, 2011 email to the JTR legal team that he was "troubled" by the epoxy findings. Moreover, Horan had reported to Silverstein and Sullivan that Jay and Steve had been "holding back" thousands of "very green" emeralds "that had been oiled (or some other substance had been placed on them)."  Horan "voiced doubts as to whether they had actually been recovered from the 'emerald patch.'"  Horan explained further that "Jay and Steve's explanation as to [the emeralds'] origin have varied."  Nevertheless, Silverstein insisted that there was no "dispositive proof that Jay has been untruthful."  Thus, for months afterward, rather than acknowledge the likelihood that Miscovich's story was a fraud, seek out the truth and urge candor with the Court, Motivation and the Plaintiffs, Silverstein hid behind the smokescreen of "dispositive proof" and actively fought disclosure of the laboratory test results.

100.    By December 16, 2011, Motivation had offered repeatedly to withdraw its claim if it could examine the emeralds and determine that they were not from the *Atocha* or *Santa Margarita*. Rather than accept Motivation's offers, Silverstein ratcheted up the litigation and aggressively fought to conceal the epoxy evidence.

101.    On December 16, 2011, Daniel McAllister, a mining engineer from Colombia with experience in the Chivor and Muzo emerald mining regions, who, according to Horan, had a "tremendously good background," reported to JTR and Silverstein that the test results showing epoxy were "rock solid" and that JTR should "*disclose publicly very soon, tomorrow or the day after, publicly*, the [epoxy findings] and leave the implications for others to determine." (emphasis added) On December 18, two days after being urged to publicly disclose the epoxy, Silverstein directed McAllister not to disclose the epoxy findings. Silverstein warned McAllister that he was

subject to a non-disclosure agreement and that no one should comment publicly about the test results.

102.    The existence of modern epoxy resins on the emeralds ruled out the *Atocha* and the *Santa Margarita,* and any pirate shipwreck, as the source of the emeralds. Silverstein, Sullivan, and JTR, therefore, knew that Mathewson's Executive Summary filed on October 18, 2011 was false. The "rock solid" laboratory findings of epoxy resins ruled out Mathewson's suggestion that the emeralds were mined "in the temporal range 1570-1700" and that "the site could very well represent pirate cargoes."

103.    Horan urged full disclosure and advised JTR and Silverstein that the laboratory test results must be filed with the Court. Silverstein dismissed any such obligation, insisting that "with a little luck" the "dispute with Motivation will be concluded by [February 2, 2012]."

104.    Silverstein continued to insist that the laboratory test results were only "preliminary" and that Miscovich, Elchlepp and Scott Miscovich were "extremely suspicious of the two labs." In a December 27, 2011 email to Silverstein and the JTR team, Horan disagreed:

> I would like to know what would prove that Jay and Steve have been untruthful with regard to their discovery of the emeralds and their statement that they have no idea how the emeralds got there. What any one of us accept as conclusive proof may very well be different. Having over a third of a century in shipwreck salvage and working with salvors, provides me with a unique perspective.

105.    Just a few weeks later, on January 6, 2012, JTR filed its Second Status Report.  In this report, JTR advised the Court that JTR had recovered additional emeralds and that "JTR has submitted samples of the emeralds for analysis to the Smithsonian Institute, the Gemological Institute of America ('GIA') and to laboratories in France and Switzerland." Further, the Report indicated that JTR "is currently waiting for final reports of the analysis from … Switzerland" even though JTR had already received the Swiss report.  Even then, neither JTR nor its counsel

Silverstein disclosed that some of the test results were already known, showing that the emeralds were coated with modern epoxy, or that JTR's pirate ship story was then known to be false.

106.     Silverstein continued to demand that the epoxy evidence should not be disclosed to the Court absent "conclusive proof that Jay has been untruthful." Silverstein ignored the facts that Miscovich had admitted being untruthful about what he allegedly found at the site (bogus coins), the location of the emeralds (thousands of emeralds were held back), and the use of a magnetometer to find the "emerald patch." Silverstein also ignored Horan's reports that emeralds he found while diving the site appeared to be planted and that "Jay and Steve" had given varying accounts of the origin of the emeralds. Moreover, the epoxy was proof that the emeralds were of modern origin and that JTR's first Status Report was false. Silverstein complained that Motivation's effort to inspect the emeralds was an "abuse of the judicial system" because Motivation was not "a private attorney general" tasked with determining the "validity of claims." Perhaps blinded by his and his firm's financial stake in the JTR scheme and the costs and fees already sunk into the venture, Silverstein renounced any obligation to finding the truth; all that mattered was winning.

107.     By email dated February 5, 2012, Silverstein insisted that the entire JTR legal team keep the test results secret from the Court, Motivation and the Plaintiffs: *"We need to remain silent about … the enhancement issue….*For now, this means that *it is important that there be no disclosure of these issues to (i) the Court, (ii) Motivation, or (iii) [John] Holloway and his clients* [Plaintiffs herein]." (emphasis added)

108.     In February, 2012, Horan drafted and circulated a proposed Third Status Report for filing in the admiralty case. That draft advised the Court about the epoxy found on the emeralds and that JTR's prior filing representing that the emeralds could be from a pirate

shipwreck was incorrect.  Silverstein and Sullivan directed Horan not to file the draft Third Status Report.   Conveniently, Silverstein chose this time to inform the JTR team that there were insufficient funds to pay Horan and that he would have to be replaced as local counsel for JTR.

109.   As noted above, on February 21, 2012, at the dinner where he bragged about "controlling" JTR, Silverstein attempted to raise additional funds for JTR from the Plaintiffs. While soliciting Plaintiffs for more money, Silverstein concealed the laboratory test results showing that the emeralds were coated with modern epoxy, as well as the accumulating evidence that Miscovich lied about material aspects of his story.

> **b.      Horan Warns Silverstein and Sullivan of Fraud on the Court, and Silverstein Threatens to Sue Him.**

110.   Less than two weeks after Silverstein met with Ash in New York, in an email dated March 1, 2012, Horan implored Silverstein to immediately disclose the laboratory test results to the Court. "Failure to advise the Court as to the French, Swiss and GIA enhancement reports would, in my mind, be the *equivalent of an affirmative misrepresentation*…The court is presently under the impression that all of the stones were recovered from an old shipwreck in an area outside of territorial boundaries. We now know that all the labs have confirmed there is modern enhancement on the vast majority of the stones that have been tested.  *It must be clearly understood that I have a moral and ethical obligation to act on my duty to be candid with the court*." (emphasis added)

111.   Horan further cautioned Silverstein:  "No privilege attaches to communications between an attorney and a client *with respect to transactions constituting a false claim or perpetuation of a fraud*.  Look at *Dodd v. The Florida Bar*, 118 So.2d 17 (Fla. 1960)." (emphasis added)

Active 22633414v2

112.     In his March 1 email, Horan also confirmed that "some time ago you [Silverstein] made the mistake of threatening me with litigation."

113.     The following day, Mark Davis, a lawyer with a Hawaii law firm that also represented JTR, acknowledged in an email to Horan, Sullivan, Silverstein and others that "like in any case, evidence arises that may disprove allegations."  He observed that Miscovich's story was "beyond fantastic but I can't even imagine a scenario that would make sense to explain all that we have confirmed as true."

114.     Silverstein nevertheless blocked the filing of a Third Status Report that would disclose the epoxy evidence.  In an email dated March 26, 2012, Horan responded to Silverstein's continuing resistance, stating: "You [Silverstein] may be the only one of us who would let Judge King learn material facts about the case by watching 60 Minutes or from some other third party."  Under pressure from Horan and recognizing that 60 Minutes would air in April and would disclose the epoxy findings, Silverstein proposed a plan to postpone disclosure as long as possible.  In an email dated March 26, 2012, Silverstein wrote that the Third Status Report should be filed under seal "the Friday before the 60 MINUTES segment airs" and then "to release the seal after the 60 MINUTES segment airs."

115.     Silverstein wrote the first draft of a Third Status Report.  In his draft, Silverstein tried to spin and obscure the epoxy findings.  His draft states that the labs "have reported spectroscopic analyses … consistent with the conclusion that there is oil and/or epoxy resin on or within the inclusions of the majority of the emerald samples evaluated."  His draft explained that "[i]f there is epoxy" on the emeralds, then the emeralds may not have been in the ocean prior to the 1930s.  Also, Silverstein's draft states that none of the labs "stated with any degree of scientific probability or certainty what substance was found on the emeralds."

30

116.     Silverstein ultimately failed in his plan to block disclosure of the epoxy findings in the *in rem* proceedings. Silverstein was aware that on April 22, 2012, CBS's "60 Minutes" program would air a feature on Miscovich's alleged find that would reveal that the emeralds were coated with epoxy. Unable to keep the laboratory test results secret any longer, Silverstein directed Horan to finally correct the false "Executive Summary" by filing a Third Status Report on April 18, 2012 — the Wednesday  before "60 Minutes" would air on Sunday evening.  The Third Status Report disclosed that the labs found epoxy on the emeralds.

117.     By blocking Motivation's request to see the emeralds and leaving uncorrected JTR's false "Executive Summary," Silverstein had successfully kept secret for nearly *five months* the fact that the emeralds were coated with modern epoxy while he tried to have Motivation's claim dismissed and tried to raise more money from new potential investors for JTR.  Judge K. Michael Moore of the United States District Court for the Southern District of Florida later held that JTR wrongfully withheld the test results from the Court: "Ultimately, JTR had the information regarding the modern epoxy as of December 2, 2011.  However, JTR did not disclose this information to the Court until April 18, 2012."

118.     On August 14, 2012, Motivation's emerald expert, Manuel J. Marcial ("Marcial"), with over 55 years of experience in the emerald business, examined the emeralds and concluded that they could not have come from the wrecks of the *Atocha* or the *Santa Margarita* because the emeralds were low quality and showed no evidence of immersion in sea water. Marcial also noted that at least one of the specimens appeared to have been attached to a rock with "Krazy Glue," and the emeralds were obviously oily, indicating a modern enhancement (*e.g.,* epoxy). Silverstein, calling Marcial an "idiot," suggested that he should be sued for defamation.

31

119.    True to its longstanding promise to withdraw its claim if an inspection revealed that the emeralds did not come from the *Atocha*, Motivation filed a motion to withdraw its claim three days later on August 17, 2012.

120.    Five days later, on August 22, 2012, Horan announced that he intended to withdraw as counsel to JTR.  Silverstein then immediately threatened to sue Horan. By email to the JTR group, Silverstein complained that Horan's withdrawal "sends the totally wrong message" and that "he needs to be threatened with sanctions and/or suit for malpractice – and remind him that he contractually consented to personal jurisdiction in Delaware in the event of any dispute with the client."

121.    On August 27, 2012, Motivation filed a motion in which it alleged that, among other things, Silverstein should be sanctioned as an active and knowing participant in Miscovich's fraudulent scheme and for directing the bad faith litigation to resist any inspection of the emeralds, knowing that Motivation would learn that the emerald discovery claim of JTR was bogus.

### c.    The Horan Memorandum Confirms Defendants' Knowledge of More Red Flags of Fraud.

122.    Three days later, on or about August 30, 2012, Horan informed Sullivan by e-mail that he was prepared to withdraw as attorney of record for JTR because "If testimony is required in the pending [sanctions] motions, I highly doubt that I could allow some testimony to stand while fulfilling my responsibility as an Officer of the Court." Horan annexed to his e-mail a detailed memorandum summarizing his numerous misgivings about the case, including the facts that the "general counsel" for JTR, Silverstein, instructed him not to correct a false report in the *Key West Citizen* newspaper and that Silverstein had refused to allow Motivation's expert, Manuel Marcial, to inspect the stones.

123.    Horan's memorandum set forth several facts (which he called "surprises") that

raised red flags of fraud.  For example:

> a.    Miscovich and Elchlepp claimed that they had used a magnetometer to find the emerald site, but they had no idea that a large modern wreck -- that would have easily shown up on a magnetometer -- was less than 200 feet away.

> b.    Miscovich and Elchlepp lied about finding coins on the site.

> c.    Silverstein threatened "dire legal consequences" if Greg Stemm and Daniel McAllister released the test results showing modern epoxy resins on the stones. Horan stated: "*It started looking like a 'cover up' and possible fraud. Bruce did not want me to file the Status Report confirming the Swiss and French etc. results* and I insisted that if I was prohibited from filing the status report, I would withdraw."

> d.    When Horan personally dove the site, he only found emeralds where Miscovich and Elchlepp directed him to look. One particularly large stone was placed neatly in a hole in a steel beam.

> e.    After Miscovich was appointed substitute custodian and the Court ordered the entire find to be  deposited in a bank vault in Key West, "Jay and Steve show[ed] up with a large clear plastic bag containing thousands of small (very green) emeralds that they explained that they were 'holding back' until the case looked like it would be won.  *I told Sully [Paul Sullivan] that I believed that the large bag of 'new' emeralds contained emeralds that had been oiled (or some other substance had been placed on them) and I voiced doubts as to whether they had actually been recovered from the 'emerald patch.'* Jay and Steve's explanations as to their origin have varied."

> f.    Daniel McAllister advised Horan that "all of the recovered emeralds may not sell for enough to repay the investors."

> g.    Silverstein refused to appear as counsel of record in the Southern District of Florida.  Horan complained: "For a long time, I have requested Bruce to appear Pro Hac in our litigation. *He is actually calling most of the shots, but he refuses to appear.*"  (emphases added)

124.    Horan's email to Sullivan, and its attachments, was forwarded to Silverstein.

Silverstein again did nothing to investigate the issues identified by Horan and ignored his

warnings. On October 8, 2012, Horan filed a motion to withdraw as JTR's counsel, citing "a

fundamental disagreement between the undersigned and the client regarding how this action should be conducted."

125.     Rather than heed Horan's warnings or examine the accumulating evidence of fraud, Silverstein doubled down on Miscovich's scheme. Thus, on October 10, 2012, only two days after Horan withdrew as counsel, Silverstein signed and filed a sixty-five page affidavit and legal brief in response to Motivation's motion for sanctions, accompanied by over 650 pages of exhibits. Among other things, Silverstein personally vouched for the honesty of his clients and business partners: "I have come to believe that [Miscovich] has, in fact, made an amazing discovery."  Despite having ignored Horan's warnings of fraud, refused to investigate Miscovich's known lies and with full knowledge of the test results showing the emeralds to have been treated with modern epoxy resins, Silverstein represented to the Court and the parties that "more than ten attorneys at my firm and at two other firms…have reviewed thousands of pages of source documents, conducted numerous interviews, and performed substantial research, and *we have been unable to uncover any evidence that caused us to believe that Jay has fabricated the story of his discovery of the emeralds*."  (emphasis added)  Quoting from his filings in the Delaware case, Silverstein reiterated: "If Jay, Scott and Steve [Elchlepp] are successful in their endeavors, *their story will show them to be honest, moral, hard-working individuals* who do not remotely resemble the portrait painted by the reckless and slanderous allegations in Plaintiffs' pleadings." (emphasis added)

126.     Silverstein's affidavit was false and misleading and materially advanced the fraud on the Court and upon Plaintiffs.  Silverstein's knowledge that the emeralds were coated with epoxy resins, when coupled with his knowledge that Miscovich and Elchlepp lied about finding coins at the alleged emerald site, the Marcial report, his awareness of Horan's detailed written

34

warnings of fraud, perjury and cover-ups, and the reasons for Horan's resignation, demonstrate that Silverstein's affidavit was false and that Silverstein knew – or recklessly ignored the fact -- that Miscovich's alleged "find" was fraudulent.  Nor, as an officer of the Court, did Silverstein disclose to the Court his personal financial interest in JTR (the subject matter of litigation), YCST's contingent equity interest in JTR, or the fact that Paul Sullivan, a member of JTR's advisory board, was Silverstein's partner in P&B Finance.

127.    At this same time, Silverstein demonstrated his awareness of a lawyer's ethical obligations to reasonably investigate his client's case and to withdraw if the client's claim is not well founded.  In an email on October 12, 2012, to Marlow White ("White"), a lawyer representing Motivation, Silverstein admonished White that "even if Motivation refuses to act responsibly" the Florida Rules of Professional Conduct required White, and his partner Gene Lewis ("Lewis"), to withdraw from representing Motivation.   Silverstein lectured that Lewis and White had an obligation to "conduct a reasonable investigation" of Motivation's claims and that if Lewis and White continued to represent Motivation, then "my firm [YCST] and I [Silverstein] … will have little choice but to aid JTR's counsel of record in the ongoing proceedings in its pursuit of  all appropriate remedies…."

128.    The very next day, on October 13, 2012, when Silverstein knew about all of the warnings and evidence of fraud noted above, JTR filed a brief stating:

> *JTR submitted the affidavit of Bruce L. Silverstein, Esquire to establish the legitimacy of JTR's claim*, including its genesis and complete history prior to the filing of the instant admiralty claim, to demonstrate the extensive scientific efforts and willingness JTR has undertaken to date, through testing to determine the origin of the instant emeralds, and to show that the issues Motivation has tried to raise concerning the Delaware Litigation and the Kirby Site are red herrings. *The Silverstein Affidavit shows, beyond peradventure, that JTR's Verified Claim most certainly is not a fraud on the court,* and that Motivation's Motion for Sanctions should be summarily denied. (emphasis added)

129.     Concerned that JTR's claims in the admiralty case were fraudulent, JTR's local counsel John Siracusa ("Siracusa") and Joe Janssen ("Janssen") dove the alleged emerald site with Elchlepp in November 2012 and, under Elchlepp's oversight, found more than 70 emeralds.  The following month, in December 2012 (after the December trial before Judge King), Siracusa and Janssen dove the same site twice, now without Elchlepp, and this time did not find a single emerald.  Upon information and belief, Janssen or Siracusa advised Silverstein and Sullivan that when they dove the site without Elchlepp, they did not find any emeralds at the site.

### VIII.     Silverstein Threatens Plaintiffs, Lawyers and Witnesses Who Challenge Defendants' Claims

130.     Defendants' facilitation of the fraud was not limited to filing false documents with the Court and concealing the truth from the Plaintiffs. Beginning in October 2011, JTR and Silverstein regularly threatened Motivation and its counsel with sanctions, motions and lawsuits. After Motivation's expert, Marcial, inspected the emeralds on August 14, 2012, and reported that the emeralds could not have come from the *Atocha* or the *Santa Margarita*, JTR threatened to file a Rule 11 motion against Motivation and its counsel if they disclosed Marcial's conclusions to the Court.   Silverstein also suggested suing Marcial for defamation. As noted above, when Horan stated that he might withdraw as counsel to JTR, Silverstein threatened to sue him for malpractice and to seek sanctions against him.

131.     Indeed, Silverstein's threats and expressions of hatred for Motivation were almost constant.   He referred to Motivation and its counsel as "scum" (email 11/1/13); threatened Motivation's counsel that "torpedoes are on the way" (email 10/12/12);  threatened that "when this is over, I am going to sue [Motivation and its counsel] for abuse of process, libel, slander, and other things" (email 1/8/14); advised Miscovich that when he wins "it comes time to sue and destroy these folks" (email 1/2/13); instructed Florida counsel, "please do not persuade Motivation

36

to refrain from filing its motion to compel" because Silverstein wanted to "bash them over the head with our response" (email 9/30/12); in a press statement, Silverstein threatened "legal redress from Motivation and its representatives" (email 8/20/12).  Angry at Horan for withdrawing from the case for ethical reasons, notwithstanding Silverstein's threat to sue him, Silverstein later wrote that Horan was "incompetent" (email 10/27/13).

132.    JTR retained its own expert, Mona Miller ("Miller"), who largely agreed with Marcial's findings. After Miller issued her report to JTR, John Siracusa, JTR's then counsel of record, advised Miller to keep her report secret. Upon information and belief, at a dinner meeting in Key West, Silverstein urged Miller to report an inflated valuation for the emeralds. Miller refused.

133.    By order dated November 2, 2012, the Court scheduled a trial to commence on December 3, 2012 to determine "(a) whether Plaintiff JTR can prove it was the first, genuine finder of the *res,* or whether JTR perpetrated a fraudulent 'find' in order to create a federal admiralty claim and potentially legitimize [the] stones …and… (b) what entitlement, if any, Claimant Motivation Inc. holds to the *res."*

134.    On November 2, 2012, the same day that the court issued its scheduling order, Silverstein asked Ash, through counsel, to testify on Silverstein's behalf and to state that the claims made by Plaintiffs in the Delaware case were a "big misunderstanding."  When Ash stated through counsel that this was not true and that he would not testify falsely, Silverstein sent a threatening email to Ash's attorney. Days later, after Motivation's witness list was filed, Silverstein threatened Ash again by email, warning that if Ash testified, there would be "consequences…for him" and that he would be "jeopardizing his own interest…if he attends the trial." Ash did not attend the trial because he did not want to deal with threats and further litigation with Silverstein.

135.    On the night before the December 2012 trial was to commence, Silverstein sent Motivation's counsel an email expressing Silverstein's view that Judge King was giving Motivation's counsel "enough rope to hang yourselves" and that if Motivation persisted with its fraud claim, "JTR will be pursuing its legal remedies against the Kirby Group and you and your client." Silverstein wrote that Motivation's lawyers were "just digging your own graves by continuing to pursue this frivolous and sanctionable course of conduct." Silverstein closed the email with: "You can't say you were not warned."

136.    As a witness at the trial in December, 2012, Silverstein was excluded from the courtroom, and he knew that he was not permitted to talk to other witnesses. While waiting to be called to testify in the hallway outside the courtroom, Silverstein confronted two of Motivation's witnesses, Marcial and Robert Baer, and threatened to sue them if they testified.  Both of these witnesses testified at the trial that they had been threatened in the hallway by Silverstein. Joe Sweeney, an employee of Motivation, witnessed the incidents and was himself also threatened by Silverstein. In total, Silverstein threatened at least seven individuals: Neil Ash, Dean Barr, David Horan, Robert Baer, Manuel Marcial, Kenneth Rose, and Joe Sweeney. These threats were intended to obstruct justice by preventing these individuals from testifying truthfully against JTR.

137.    Silverstein also was aware of witness intimidation by others in the JTR group. Ed Krajewski ("Krajewski") and Gerry Edwards ("Edwards") were on the Motivation witness list in connection with the December 2012 trial.  Elchlepp had told Silverstein in a July 2012 email that he wanted Krajewski to be "fish food." In an email to Silverstein and Sullivan on November 2, 2012, Elchlepp wrote that "if the accusations continue from Krajewski (sic) and Edwards, I will take matters into my own hands and let the cards fall where they may. Guys like [Krajewski] keep getting away with these tactics because no one is stopping them."  Soon after Elchlepp

38

communicated these threats to Silverstein and Sullivan, Edwards encountered a booby trap device rigged with a shotgun shell. The device failed to discharge. Krajewski was in a automobile accident caused by the removal of all of the lug nuts from the right front wheel of his car.

### IX.    Miscovich and Elchlepp Perpetuate The Fraud Under Oath

138.    A trial to determine whether the Court had admiralty jurisdiction commenced on December 2, 2012 before the Hon. James Lawrence King.  The sanctions issues were severed for a separate trial to be conducted at a later date.  With full knowledge of the evidence of fraud noted above, Defendants presented Miscovich, Elchlepp and Silverstein as the key witnesses for JTR in the December 2012 trial.

139.    In their December 2012 trial testimony, Miscovich and Elchlepp related the story of Miscovich's meeting with "Mike Cunningham," the purchase of the treasure map, the pottery shard, and the discovery of the emerald site on January 11, 2010.   Elchlepp testified that he dove the site about 70 times and that he found emeralds on every dive.

140.    Miscovich testified that he paid "Mike Cunningham" $50,000 in cash, in exchange for a release of any and all claims to the treasure.  Miscovich stated that he accumulated the $50,000 payment by making multiple ATM withdrawals over a period of a month.  Miscovich testified that the release signed by "Mike Cunningham" (the "Release") had been prepared by the Proskauer firm, and that a copy had been provided to Silverstein and YCST. The signing took place at the Eagle Club in Latrobe, Pennsylvania. Miscovich stated that he called Alan Roth, a local attorney in Latrobe, and asked for a notary.  Roth sent an employee, Stacey Wolfe, who witnessed the signing at the Eagle Club and notarized the Release.

141.    The December 2012 trial was the first time that Plaintiffs or Motivation learned the name of the alleged seller of the map.  Nor had Motivation or Plaintiffs previously seen the alleged Release, which was marked as an exhibit at the trial.

39

142.     After the conclusion of testimony on December 21, 2012, Plaintiffs retained an investigator in Latrobe, Pennsylvania to find "Mike Cunningham" (allegedly a former employee of Miscovich's in Latrobe) and to help check Miscovich's story.  Plaintiffs also retained a lawyer in Latrobe to assist with the investigation.  As the investigator and lawyer did their work, Miscovich became increasingly worried that his fraud would be discovered.  In an email to Silverstein and Sullivan on January 2, 2013, Miscovich reported that he had heard that "they have hired a scumbag atty in Latrobe" to find Mike Cunningham.  Miscovich wrote: "can we call this atty????????or do I just put a bullet in his fucking head !!!!!"  On January 14, 2013, Silverstein emailed Plaintiffs' counsel, stating that Silverstein had "been told that [Ash and Barr]  … has hired lawyers and/or private investigators who are working in or around Latrobe  and looking into, among other things, Jay's account of how he got the map.  Is there any truth in this?"  Plaintiffs' counsel responded: "Yes, of course I'm checking Jay's story.  As I've told you, I'm trying to determine if the "find" is a fraud."

143.     By the end of January 2013, Plaintiffs and Motivation had located and interviewed Mike Cunningham and learned that Cunningham was in prison in April 2010 (when he supposedly received $50,000 for a release) and that Cunningham knew nothing of any map or deal with Miscovich. It was clear that Miscovich and Elchlepp's "map story" was entirely fabricated and that they had committed perjury during the December 2012 trial.

144.     After confirming that JTR was a fraudulent enterprise, Motivation began gathering additional evidence for use during the sanctions trial.  In time, an overwhelming volume of evidence of fraud accumulated.   This evidence included the following:

a)     As summarized above, Miscovich purchased Colombian emeralds in bulk from a gem dealer in Jupiter, Florida.

b)      Miscovich was in Latrobe, Pennsylvania making ATM withdrawals, making Internet purchases from his home computer, and doing other banking transactions during January 1 through January 22, 2010, at the same time when he claimed to be in Key West, Florida making the "historic find," diving with Elchlepp, and recovering thousands of emeralds.

c)      Miscovich and Elchlepp submitted to Emerald Reef hundreds of receipts for their expenses incurred as part of their alleged salvage efforts, including both large and trivial amounts (as low as 75 cents).    Miscovich and Elchlepp testified that they worked the emerald site seventy or more times (mostly in 2010) at a cost of $500 to $600 per trip. Despite this, Miscovich and Elchlepp did not submit a single invoice for expenses incurred working the emerald site.

d)      Certified National Oceanic and Atmospheric Administration (NOAA) Weather Records show that the alleged shipwreck dive area in Key West on January 9 through 11, 2010 was subject to gale force winds and conditions, which were far too rough for scuba diving from a small craft.

e)      As described above, expert testimony revealed that the emeralds could not have been submerged in a marine environment for a significant amount of time because there was no sign of microscopic sea life on any of the emeralds.

f)      Testing revealed that the emeralds were coated with epoxy resin, proving that they were mined in modern times. Expert testimony at the 2012 trial revealed that epoxy resin will not remain long on emeralds on the bottom of

41

the Gulf of Mexico (or any ocean) because of the effects of salt water and abrasion from the sandy bottom.

g)     Archeologist Bob Baer ("Baer") wrote a narrative for Miscovich about the alleged emerald find for promotional materials based on an early version of the "find" story provided by Miscovich. Baer testified at the December, 2012 trial that Miscovich claimed that the emeralds were found in 2009 while Miscovich dove with two Mexican friends. While Miscovich testified that he intentionally made false statements about the location of the "find" to mislead anyone hoping to pilfer his site, neither the year of the "find" nor the ethnicity of his co-divers had anything to do with the location of the alleged site.

h)     Ivan Taback, the attorney in charge of Proskauer's work for Miscovich, testified by deposition that his firm knew nothing about the Release and that the firm did not prepare the Release. Moreover, on its face, the one-page Release was obviously prepared by an amateur and not by a professional lawyer at a major corporate law firm, such as Proskauer. For example, the primary purpose of the release was to confirm that "Mike Cunningham" released salvage rights to emeralds found in the Gulf of Mexico. But the Release does not mention "salvage rights" nor does it even mention emeralds. Nor does it mention the Gulf of Mexico or any other language describing the general area of the alleged find. Furthermore, the form of the Release is far too simplistic and vague to have been prepared by a professional. As the lead partner at Proskauer testified, the Release "does

42

not look like documents that our law firm prepares." The invoices submitted by Proskauer do not detail a single time entry for drafting a release relating to "Mike Cunningham."

i)    A man named Michael Charles Cunningham, who worked for Miscovich in Latrobe, Pennsylvania for seven years, testified by deposition that he knew nothing of Miscovich's treasure story.  Mike Cunningham testified that he had never been to Key West, that he never sold  Miscovich (or anyone) a treasure map, that he never received $500 or $50,000 from Miscovich and lastly, that he was in prison in April 2010 when  Miscovich said he signed the Release and received $50,000 at the Eagle Club in Latrobe.

j)    Alan Roth, the lawyer in Latrobe, testified that Miscovich never called him and that he had terminated Stacey Wolf's employment in 2008.  Stacey Wolf testified by deposition that she notarized the signatures of Miscovich and a "Mike Cunningham" at the Eagle Club bar on April 20, 2010. She also testified, however, that she and Miscovich were long-time friends and that Miscovich had contacted her directly. A highly qualified expert document examiner, Erich J. Speckin, determined that the entries in Stacey Wolf's Notaries Register for April 10, 2010 (including an entry for notarizing the "Mike Cunningham" Release) were written more than a year after their purported dates in Wolf's Notaries Register.

k)    The manager of the Eagle Club, Cary Borza, testified by deposition that the "Aerie House Rules" at the Fraternal Order of Eagles (or Eagle Club) require all guests entering the "Aerie" must be signed in by a member at the

43

time of arrival. The Visitor Register of the Aerie for the period including April 20, 2010, does not show the registration of any Mike or Michael Cunningham and there is 99% adherence to the registration rule.

l)   Lisa Martorano, Miscovich's assistant, and Tobia both stated that they accompanied Miscovich on trips to buy emeralds in Jupiter, Florida.

m)   Miscovich testified at the 2012 hearing that he amassed $50,000 in cash by making a series of withdrawals from his personal bank account with PNC Bank in Pennsylvania, all in April 2010. Miscovich's personal bank records show that he did not in fact make $50,000 in cash withdrawals prior to the alleged April 20, 2010 payment and signing of the Release with "Mike Cunningham."

145.   To summarize, the falsity of Miscovich's story was established by depositions and statements taken from Mike Cunningham, Stacey Wolf, Proskauer partner Ivan Taback, Peter Tobia, Anthony Santelli, Lisa Martorano, the manager of the Eagle Club, and expert ink analysis of Wolf's notary log. Miscovich's story was also refuted by documentary evidence, including Miscovich's PNC Bank Records, the Proskauer invoices, and receipts submitted by Miscovich for reimbursement of salvage expenses in 2010.

146.   Sullivan and Silverstein had the spurious "Michael Cunningham" Release in their possession for *more than a year* before the December 2012 trial. As early as November 18, 2011, Silverstein told his trial team in an email that he had the document and would "review" it. In fact, Silverstein never questioned the one page document, investigated its authenticity or attempted to contact "Mike Cunningham" or Ivan Taback. Indeed, Defendants never tried to verify any aspect

44

of Miscovich's story, despite Silverstein swearing that his legal team had examined "thousands of pages of source documents" and "interviewed dozens of witnesses."

147.     After Plaintiffs and Motivation first learned at the December 2012 trial that "Mike Cunningham" was the person who allegedly sold the treasure map to Miscovich, they needed less than three weeks to locate Mike Cunningham and prove the story to be a lie. *Any* degree of diligence, much less the efforts of Silverstein's firm of over 100 lawyers and his alleged team of "more than 10 lawyers," would have quickly revealed the fraud.  Instead, JTR and Silverstein claimed that Motivation had found the "wrong Mike Cunningham."  At a sanctions hearing in the admiralty case in January 2014, Sullivan finally admitted that Motivation had probably found the right Mike Cunningham.

148.     Silverstein and Sullivan were aware of all of the evidence of fraud. As insiders with access to Miscovich over three years, his documents, and JTR's documents, Silverstein and Sullivan had ample reason to know that JTR was a criminal enterprise.

149.     After hearing Miscovich testify that he and Elchlepp found the emeralds on January 11, 2010, Sullivan and Scott Miscovich (members of JTR's Advisory Board) consulted meteorological records for the area of the Gulf of Mexico in which the emeralds were allegedly discovered during the period January 9-11, 2010.  The records indicated that a powerful storm was blowing on those dates, which would have made diving from a small craft impossible.

150.     As members of JTR's Advisory Board, Scott Miscovich and Sullivan informed Silverstein of their findings and their concerns. Silverstein was unmoved.

151.     Scott Miscovich, then worried that he may be aiding a fraudulent conspiracy, contacted Tobia by telephone in February 2013 and recorded the calls without Tobia's knowledge or consent.  Tobia confirmed that he had accompanied Miscovich on an emerald purchase in

45

Jupiter, Florida, that Miscovich's claims were "phony baloney," and that Miscovich had purchased emeralds in bulk with money provided by Santelli.  Scott Miscovich advised Silverstein of the content of these recorded calls.  Again, Silverstein was undeterred.

152.    Because he was convinced that JTR's alleged find was a fraud, Scott Miscovich withdrew from any further involvement with JTR, retained criminal counsel, contacted the FBI, and cooperated with the FBI's criminal investigation of JTR.  However, Sullivan and Silverstein continued supporting and aiding the fraudulent conspiracy.

## X.    The Court Rejects Miscovich's Story, and Schedules a Further Trial on Sanctions

153.    On January 25, 2013, Judge King issued his opinion following the December 2012 trial.   In the opinion, Judge King repeatedly questioned the credibility of Miscovich's testimony. For example, Judge King found "the story of Jay's acquisition of the purported treasure map suspicious to say the least," and the conflicting testimony of Elchlepp and Miscovich "lead the Court to, at the very least, question the reliability of Jay's account of the moment he first saw the stones." The Court noted that Baer, the marine archeologist, had interviewed Miscovich and been given an entirely different story about how Miscovich discovered the site with "two friends from Mexico" and brought up eighty pounds of stones on the first day. The Court also noted the testimony of Marcial that some of the stones had been treated with 20th-century materials that would have disintegrated under water, and that the stones were worth only about $50,000.

154.    Judge King ruled that JTR had failed to prove any basis for admiralty jurisdiction and dismissed the case without making a salvage award or awarding title under the American Law of Finds. Judge King found that "The record is devoid of any evidence of any shipwreck, 16th Century Spanish Galleon, or any proof of abandonment by a prior owner. *The res has appeared seemingly out of thin air*…" (emphasis added)

46

155.     The Court concluded that "[t]here is just as much support for the theory that Jay and Steve [Elchlepp] planted the stones as there is for the assertion that they found them. The Court cannot simply accept the un-contradicted testimony of Jay and Steve that they followed a treasure map to the site, dove to the floor, and found the emeralds."

156.     The Court assessed court costs against Miscovich and Elchlepp, and ordered the stones returned to their custody (without color of title or authenticity) upon payment of such costs.

157.     Remarkably, Silverstein's reaction to the Court's findings just days later was to look for new ways to continue the scheme. He recommended forming a "new entity" to make a "new find…over the next week" in a new location and then file a "new claim." In an email dated January 29, 2013, Silverstein stated:

> A new entity needs to be created in which the JTR members all have essentially the same membership interests, which could file a new claim based on a new find (if there were one) that is made over the next week — and I don't mean the Luchenbach.  If Joe [Janssen] and/or John [Siracusa] were to dive the site and find something new, I would be willing to form a new entity with a Managing Member other than Jay — which preserves the existing economic interests of the members of JTR (including Jay), but with an appropriate increase for John and Joe (and Christy [Janssen's wife and law partner] and Eric [another investor]) — that could file a new claim if it were appropriate to do so.
>
> Aside from funds I have provided Jay and Steve to stay afloat, my firm is into this for $1.6 million attorneys' fees and expenses.  Accordingly, I am not inclined to do very much, if any, further legal work on this matter.  Nor am I inclined to provide any further funding at this time.

158.     By order dated February 15, 2013, the Court scheduled a further trial on Motivation's motion for sanctions.

## XI.     Faced with Evidence of Fraud, JTR's Trial Counsel Seeks to Withdraw, But Silverstein and Sullivan Re-Commit to JTR

159.     Confronted with evidence that he had purchased the emeralds in Jupiter, Florida, Miscovich told his counsel that he had been keeping emeralds found at the emerald site in a bank vault in Jupiter, a four-hour drive north of Key West, at the times when Tobia and Martorano

accompanied Miscovich to Jupiter to purchase emeralds.  On October 4, 2013, Siracusa emailed Jay Miscovich, asking "what is the name of the Jupiter bank you kept the emeralds at and what street was it on?"   Miscovich never responded.

160.    In early October, 2013, Miscovich composed an anonymous letter to Joe Sweeney, an employee of Motivation, and asked his former assistant, Lisa Martorano ("Martorano"), to mail the letter from Pensacola, Florida, so the postmark could not be traced back to Miscovich in Latrobe.  The letter explained to Sweeney that Motivation was "looking in the wrong direction" and described a bizarre conspiracy between Gregg Stem of Odyssey Marine (a legitimate salvage company), Scott Miscovich, Sullivan, and the government of Columbia, to somehow set up Jay Miscovich and Elchlepp.  Martorano's statement and a copy of this letter were provided to Sullivan and Silverstein.

161.    By no later than October 2013, Siracusa had concluded that Miscovich committed perjury in the 2012 trial and had lied about key elements of his story. Siracusa also learned, apparently for the first time, that Miscovich claimed to have an undisclosed written agreement to give Mike Cunningham a percentage of the treasure. In an October 16, 2013 email, Siracusa told Miscovich that Siracusa, Sullivan, and Silverstein "have had some rather serious discussions … as to whether any of us continue to believe your story surrounding the April, 2010 Cunningham Release, your payment of $50,000 to him for it, the credibility of Stacy Wolfe's notary log." Siracusa continued:

> [W]ith regard to the existence of the Feb 2010 Mike C agreement, and the credibility issues concerning the April 2010 Cunningham Release, your alleged $50,000 payment for it, and Stacy's  log, there is simply no corroborating evidence to support any of this…. [W]e do not believe that we can continue to represent JTR unless you acknowledge that your Mike C story is untrue and work toward rectifying the problems that your untruthful trial testimony has caused….There are also other problems with your testimony concerning the timing of the discovery and the windy weather that week.

48

162.     Despite Siracusa's personal investment in JTR, Siracusa (unlike Silverstein) questioned whether "we" could "effectively and/or ethically represent JTR through the sanctions hearing."

163.     The same day (October 16, 2013), Jay Miscovich responded that Siracusa's firm, Janssen & Siracusa P.A. ("J&S") had not adequately explored the "shrimp boat" story.   Siracusa responded that his firm had extensively pursued the story and found no evidence to back it up. Moreover, Siracusa explained, "I have dove the site extensively and we have yet to find any shrimp boat wreckage."  Silverstein and Sullivan were copied on these email exchanges.

164.     On October 17, 2013, J&S filed a motion to withdraw as counsel to JTR.  The following day (October 18, 2013), Sullivan emailed the JTR group, including J&S and Silverstein, that Sullivan would consider taking over as managing member of JTR provided certain conditions were met, including the marketing of emeralds and making distributions to the members of JTR.

165.     On October 24, 2013, Silverstein wrote an email to Miscovich advising that Silverstein and YCST were terminating their representation of Miscovich personally.  Silverstein and YCST confirmed continued representation of JTR, however, provided that Miscovich step down as the managing member of JTR.   The same day, Sullivan again indicated his willingness to serve as managing member, but only if Silverstein "stay[s] on as JTR atty."   The same day, Miscovich responded to Silverstein's email with a return email advising that "i am stepping down Oct. 29th at 5 pm."

166.     On October 27, 2013, Sullivan wrote an email to Silverstein, Elchlepp, and J&S in which Sullivan stated that he was "willing to do anything to help including testifying in Jan. and taking over as [managing member] of JTR."

49

167.     These emails show that when faced with the ethical dilemma of admitting the truth and walking away from a substantial investment of reputations and money, or denying the truth and continuing to support the fraud on the Court, J&S properly chose to withdraw even though they were investors in JTR as well as its counsel.  In contrast, Sullivan volunteered to "do anything" to help advance the fraudulent case, and Silverstein reconfirmed his commitment to the case as JTR's counsel.

168.     Miscovich had promised to step down as managing member of JTR on October 29 at 5:00 p.m.  On October 29, 2013, weeks before the second sanctions trial was set to begin, Miscovich committed suicide.  His time of death was just prior to 5:00 p.m.

169.     After Miscovich's death, Plaintiffs and Motivation did not know who the new managing member of JTR would be.  In the mistaken belief that Sullivan would take over and that he was honest, Motivation hoped that JTR would now abandon the fraud.   In November, 2013, Motivation offered the following settlement terms to JTR: if JTR would admit the fraud and surrender the emeralds to the court, Motivation would withdraw its sanctions motion and release JTR and Sullivan.

170.     Still acting as JTR's general counsel and interested member, Silverstein immediately blocked the settlement.  In an email dated December 2, 2013, Silverstein wrote: "How could you possibly accept this.  It is mainly false."  After Siracusa suggested a counter-proposal, Silverstein responded, "I would tell Motivation to pound sand.  Indeed, I would not even begin to have a dialogue with Motivation if this is where they are starting at."   Clearly, the idea of ending the fraud and admitting the truth was the farthest thing from Silverstein's mind as he wrote in an email to the surviving members of JTR on December 9, 2013:  "This is the time to hang tough and see this thing to the end."

171.     In a December 31, 2013, email, Silverstein advised JTR's members that he had engaged a criminal defense lawyer.

**XII.**     **The 2014 Sanctions Trial: JTR Finally Admits to the Fraud; This Time, Silverstein Stays Away**

172.     After having submitting hundreds of pages to the Court and two sworn affidavits, Silverstein refused to attend the January, 2014 sanctions trial, ostensibly on advice of his counsel. Instead, he sent his JTR partner, Sullivan, to testify as JTR's official corporate representative.

173.     An FBI agent and a NOAA agent attended the trial.  An Assistant United States Attorney also attended parts of the trial.

174.     On Monday evening, January 13, 2013, the first day of the trial, a lawyer representing Rodriguez, the emerald dealer in Jupiter, Florida, advised Siracusa and Sullivan that Rodriguez would testify that he sold emeralds to Miscovich in bulk.  At the time, Sullivan was also aware that Tobia and Martorano had both already given sworn statements indicating that they had each accompanied Miscovich on separate tips to Jupiter to buy emeralds. Nevertheless, on the witness stand during the hearing the following day, Sullivan maintained that Miscovich found emeralds in the ocean and he repeatedly vouched for the honesty and integrity of Silverstein. Sullivan vehemently denied that the results of the laboratory tests had been withheld from the status reports filed with the Court by JTR, in the face of the irrefutable fact that this was exactly what happened. Throughout his two-day testimony, Sullivan tried to deny evidence that Miscovich had committed fraud, even proposing a theory -- which the trial Judge later characterized as "bizarre"-- that the emeralds came from a shrimp boat that sank in 1979 (even though Siracusa had explained to Sullivan that Siracusa dove the site several times and never saw any evidence of a shrimp boat wreck).

175.     By email to Siracusa on January 14, Silverstein claimed that Rodriguez was a liar and that Siracusa was being "set up" by the FBI and Motivation.  Still supporting the fraud and acting as general counsel to the fraudulent enterprise, Silverstein included in his email to Siracusa detailed instructions on how to cross-examine and discredit Rodriguez.

176.     JTR's counsel still refused to admit to the Court that fraud had been committed until closing arguments in the trial, by which time the whole sordid story was out and on the record. The next to last witness to testify was Rodriguez.  Rodriguez testified that Miscovich purchased 20 pounds of rough emeralds from him in March 2010, for $20,000 in cash.  Miscovich made additional purchases of rough emeralds from Rodriguez in May, August and September, 2010, again paying $20,000 each time for about 20 pounds of emeralds, plus a few emeralds in matrix, for a total of $80,000.

177.     Rodriguez further testified that after the "60 Minutes" story was broadcast, Miscovich came to his store and threatened his family if he spoke with anyone about the emerald purchases.

178.     After the conclusion of the trial on January 15, 2014, JTR's trial counsel finally admitted that Miscovich had committed fraud, and that JTR had used the courts to perpetuate the fraudulent scheme:

> The evidence is clear and convincing that Jay Miscovich either partially or wholly fabricated a story about his purported emerald find and was successfully able to convince his investors, lawyers, Dr. Jeffrey Post of the Smithsonian, appraisers, experts, jewelers, family, friends, the general public and many others, including investigative reporters from CBS' *Sixty Minutes,* that he had discovered and recovered more than 150 pounds of Colombian emeralds in the Gulf of Mexico in early, 2010. Jay Miscovich partially or wholly concocted a fraud. Whether or not the entire find was a fraud we may never know, but certainly the scheme to defraud has been made evident, which was to represent commercial-grade emeralds as having a higher value based on the origin of an antique shipwreck or some other provenance. As an artifice of Mr. Miscovich's fraud, he sought the blessing of the District Court or its "seal of approval" and used JTR, and its

52

various attorneys, including Mr. Horan and Janssen & Siracusa, to further this fraud through the filing of this admiralty claim.

179.    Recognizing potential personal liability for aiding and abetting a fraud, Siracusa emailed Silverstein on January 19, 2014, asking whether under Delaware law, "members [of JTR] may be held liable if the LLC was used as an instrumentality in the fraud." Silverstein responded the same day, explaining that the answer was "complicated."

### XIII.    The Court Finds That "This Entire Case Is Premised on a Fraud."

180.    The Court found "by clear and convincing evidence, that a fraud has been committed upon this Court." Specifically, the Court determined that (i) "JTR found out that the Emeralds had modern epoxy on them in December 2011…and failed to disclose this information to the Court until April 2012" and (ii) "this entire case is premised on a fraud."

181.    The Court explained:

On the day that Miscovich filed the instant Complaint, September 6, 2011, Miscovich *knew* that he was committing a fraud upon the Court. Miscovich's filing of the Complaint and the continued litigation of this case was a "flagrant abuse of the judicial process," …and there is no starker example of bad faith. (emphasis and quotes in original)

182.    Regarding the lab results showing modern epoxy on the stones, the Court rejected any argument that JTR was excused from disclosing the results to the Court because JTR had shared the information with "60 Minutes:"

The fact that JTR told *60 Minutes* in no way diminishes its obligation to the Court. In fact, it demonstrates that JTR knew something was going on and that these reports would have a substantial impact on the adjudication of the *res*. JTR was obligated at that point to make the Court aware of the information.

183.    On July 25, 2014, Judge James Lawrence King of the United States District Court for the Southern District of Florida issued an Order to Show Cause directing Silverstein, YCST and Paul Sullivan, Silverstein's business partner and fellow investor in JTR, to appear before the Court and show why they should not be sanctioned for bad faith litigation.

184.     Between November, 2010 and the date of filing of this Complaint, as a result of Defendants' participation in JTR's and Miscovich's continuing fraud, perjury, and obstruction of justice, Plaintiffs have incurred professional fees and out-of-pocket expenses in excess of $1.8 million. This amount is separate, and in addition to, the funds in the amount of approximately $1.6 million initially invested in or loaned to Emerald Reef, Salvage Boat Leasing, GUTS and Miscovich by Plaintiffs.

## COUNT I
### (Conspiracy to Defraud)

185.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 above.

186.     On or before January, 2010, the Miscovich Group (Miscovich, Elchlepp, Tobia, Santelli and Heimdahl) agreed and conspired with each other to engage in the acts constituting fraud against the Plaintiffs. The representations made by and on behalf of Miscovich Group with respect to the discovery, origin, value, quantity, quality, provenance, and existence of the emeralds, the emerald site, the treasure map, the salvage and recovery of the stones, and the expenses and costs associated therewith, as set forth above, were known to be false when made by the Miscovich Group. Miscovich Group's purpose in making such representations was to deceive Plaintiffs into believing that Miscovich and Elchlepp had made a once-in-a-lifetime discovery of thousands of precious stones of Columbian origin in the waters of the Gulf of Mexico, that the stones were associated with a Spanish colonial shipwreck, and that the "find" was potentially worth half a billion dollars. The Miscovich Group's fraud was intended to induce Plaintiffs to contribute funds in the form of cash and loans, and then to actively conceal the scam once Plaintiffs had parted with their funds.

54

187.    Defendants joined the Miscovich Group's conspiracy with knowledge of its general purpose and scope.  Defendants' acts in furtherance of the conspiracy included, *inter alia*, filing false affidavits and other false and misleading documents and statements with the courts; proffering false and perjured testimony; personally vouching for the integrity and truthfulness of the Miscovich Group in affidavits and testimony; threatening at least seven witnesses who challenged the Miscovich's Group's story (including Plaintiffs) with litigation and sanctions; acquiring undisclosed ownership interests in the fraudulent scheme; frustrating and preventing the recovery of Plaintiffs' funds by transferring all of the enterprise's assets to an entity formed by Defendants; waging a costly, year-long "scorched earth" litigation campaign to prevent or delay examination of the stones; actively withholding evidence of fraud, including evidence of modern chemical enhancements on the stones, from the Court; and continuing their strategy of bad faith litigation, threats and concealment of the truth on behalf of Miscovich Group long after it became evident to many – including JTR's own local Florida counsel -- that the entire enterprise was fraudulent.

188.    Plaintiffs, in justifiable reliance on the misrepresentations, concealment and false statements and filings made by the Miscovich Group and by Defendants, (i) invested or loaned over $1.6 million with Emerald Reef and Miscovich and (ii) incurred professional fees and out-of-pocket expenses in excess of $1.8 million in order to protect their rights and property, and to expose the fraud.

189.    Defendants are jointly and severally liable with Miscovich Group for each act done in furtherance of the conspiracy, including acts that took place before they joined it.  Having joined and aided and abetted the conspiracy, Defendants are liable for all damages caused by the conspiracy, including damages that occurred before Defendants joined the conspiracy.

Active 22633414v2

190.     Each of the Defendants committed the unlawful acts alleged against them, as described in the preceding paragraphs, in furtherance of this conspiracy. Many of Defendants' acts in furtherance of the conspiracy took place in Florida.

191.     By reason of the conspiracy and the acts of each of the Defendants, Plaintiffs have been injured in their business and property, including, but not limited to, the sums invested and loaned to the Miscovich Group, professional fees incurred in litigation in Delaware and Florida to protect their rights and property, forensic fees and the costs of investigation of the misrepresentations, suppressions and concealment set forth in this Complaint, and bringing this action for relief. These losses are not less than $3.4 million and were proximately caused by the unlawful acts and conspiracy of the Defendants.

192.     Defendants' conduct was fraudulent, malicious and deliberately oppressive, and was committed with wanton disregard of the rights of Plaintiffs.

193.     By reason of the injury to their business and property, Plaintiffs are entitled to an award of damages in the amount of at least $3.4 million, together with punitive damages in the amount of $10,200,000.

## COUNT II
### (Aiding and Abetting)

194.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 above.

195.     As alleged herein, the Miscovich Group made fraudulent representations to Plaintiffs, and/or fraudulently concealed from Plaintiffs, facts with respect to the discovery, origin, value, quantity, quality, provenance, and existence of the emeralds, the emerald site, the treasure map, the salvage and recovery of the stones, and the expenses and costs associated therewith.

56

196.     Acting with intent to perpetuate a fraud  and in furtherance of the fraud perpetrated on Plaintiffs, Defendants substantially aided and assisted the Miscovich Group in carrying out the scheme by: filing false affidavits and other false and misleading documents and statements with the courts; proffering false and perjured testimony; personally vouching for the integrity and truthfulness of the Miscovich Group in affidavits and testimony; threatening at least seven witnesses who challenged the Miscovich's Group's story (including Plaintiffs) with litigation and sanctions; acquiring undisclosed ownership interests in the fraudulent scheme; frustrating and preventing the recovery of Plaintiffs' funds by transferring all of the enterprise's assets to an entity formed by Defendants; waging a  costly, year-long "scorched earth" litigation campaign to prevent or delay independent examination of the stones; actively withholding evidence of fraud, including evidence of modern chemical enhancements on the stones, from the court; and continuing their strategy of bad faith litigation, threats and concealment of the truth on behalf of Miscovich Group long after it became evident to many – including JTR's own local Florida counsel -- that the entire enterprise was fraudulent.

197.     At all relevant times, Defendants knew that the actions alleged above were in furtherance of the Miscovich Group's fraudulent scheme.

198.     Plaintiffs were damaged by Defendants' aiding and abetting fraud, including, but not limited to, the sums invested and loaned to the Miscovich Group, professional fees incurred in litigation in Delaware and Florida to protect their rights and property, forensic fees and the costs of investigation of the misrepresentations, suppressions and concealment set forth in this Complaint, and bringing this action for relief. These losses are not less than $3.4 million and were proximately caused by the unlawful acts and conspiracy of the Defendants.

199.     Defendants' conduct was fraudulent, malicious and deliberately oppressive, and was committed with wanton disregard of the rights of Plaintiffs.

200.     By reason of the injury to their business and property, Plaintiffs are entitled to an award of damages in the amount of at least $3.4 million, together with punitive damages in the amount of $10,200,000.

## COUNT III
### (Racketeer Influenced and Corrupt Organizations Act - §772.103 Florida Statutes)

201.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 above.

202.     JTR constituted an enterprise as that term is defined in §772.102(4) Fla. Stat. (the "racketeering enterprise"), in violation of §772.103(2), §772.103(3), and §772.103(4) Florida Statutes.

203.     Defendants associated with the racketeering enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity as proscribed by §772.103 Florida Statutes.

204.     Defendants entered into an agreement and conspired with each other and with the Miscovich Group to conduct or participate in the affairs of the racketeering enterprise through a pattern of racketeering activity as proscribed by §772.103(4) Fla. Stat.

205.     Silverstein, YCST, Sullivan and P&B Finance, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in the racketeering enterprise in violation of §772.103(2) Fla. Stat.

206.     Part of the conspiracy was that each of the members of the racketeering enterprise agreed to conduct and/or participate in the affairs of their enterprise through a pattern of

Active 22633414v2

racketeering activity, with the knowledge and intent that at least two predicate acts of racketeering be committed.

207.     The actions set forth above in paragraphs 44 through 184 were among the overt actions taken by Defendants in furtherance of the conspiracy.

208.     The predicate acts of which Plaintiffs complain, a substantial number of which took place in Florida, are set forth below and constitute a pattern of racketeering activity.

**The Predicate Acts**

     **a.      Organized Fraud - §817.034(4)(a) Fla. Stat.**

209.     Defendants' conduct described herein constituted an organized scheme to defraud, in that each engaged in a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, or promises or willful misrepresentations of a future act, in violation of §817.034(4)(a) Fla. Stat.

     **b.      Communications Fraud  - §817.034(4)(b) Fla. Stat.**

210.     At all times, Defendants participated in the Miscovich Group's scheme, and knowingly and intentionally transmitted, transferred, or caused another to transmit or transfer signs, signals, writing, images, sounds, data, or intelligences by mail, wire, radio, electromagnetic, photoelectronic, or photo optical system to Plaintiffs, the courts and others with the intent of obtaining property from Plaintiffs in violation of §817.034(4)(b) Fla. Stat., as set forth above in paragraphs 44 through 184.

     **c.      Theft - §812.014(1)**

211.     Defendants, with the intent to defraud Plaintiffs of their property, obtained custody of their property by trick, deceit, or fraudulent or willful false representations set forth above.

59

### d.    False Official Statements - §837.06 Fla. Stat.

212.    Defendants knowingly made false statements in writing with the intent to mislead a public servant in performance of their official duties, in the persons of two Florida federal judges and a Delaware Chancery judge.

### e.    Compounding Felony - §843.14

213.    At all times Defendants had knowledge that the Miscovich Group's scheme to defraud included acts that, if successfully prosecuted, were crimes punishable by imprisonment in Florida State prison.

214.    Notwithstanding their knowledge of the criminal nature of the offenses, Defendants took money, or a gratuity or reward, or an engagement therefor, upon an agreement or understanding, expressed or implied, to compound or conceal such offenses.

### f.    Extortion - §836.05 Fla. Stat.

215.    Defendant Silverstein both verbally and by a written or printed communication, maliciously threatened to accuse one or more of the Plaintiffs of a crime or offense, and/or by such communication maliciously threatened an injury to Plaintiffs' person, property or reputation, and/or maliciously threatened to expose Plaintiffs to disgrace, with intent thereby to extort money, a pecuniary advantage, and with intent to compel Plaintiffs so threatened, to take a position in favor of the Miscovich Group and JTR against their will.

216.    Each violation of sections 817.034, 812.014, 837.06, 843.14, and 836.05 Fla. Stat., set forth above in connection with the aforementioned scheme to defraud constitutes a separate and distinct violation of Chapter 772 Fla. Stat.

217.    These acts of racketeering, occurred over a period of more than three years, and occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 772.103 Fla. Stat.

Active 22633414v2

218.     Plaintiffs were injured in their business or property by reason of these violations of Florida law in that, as a direct and proximate result of Defendants' actions, Plaintiffs suffered damages, the sums invested and loaned to the Miscovich Group, professional fees incurred in litigation in Delaware and Florida to protect their rights and property, forensic fees and the costs of investigation of the misrepresentations, suppressions and concealment set forth in the Complaint, and bringing this action for relief. These losses are not less than $3.4 million and were proximately caused by the unlawful acts of the Defendants.

219.     By reason of the Defendants' violation of Chapter 772 Fla. Stat., Plaintiffs are entitled, pursuant to §772.104 Fla. Stat. to threefold the damages sustained, with interest thereon, and reasonable attorneys' fees.

220.     At all relevant times, Silverstein was a partner, member, officer, agent, manager or employee of YCST, was a member of YCST's Management Committee, and was engaged on behalf of YCST in the rendering of professional services to JTR and the Miscovich Group.

221.     Pursuant to §621.07 Fla. Stat., YCST is liable for any wrongful acts or misconduct committed by its partners, officers, agents, members, managers, or employees and is, therefore, vicariously liable for the wrongful conduct of Silverstein complained of herein, which at all times was performed in the course of scope of the employment of Silverstein, and was performed in furtherance of the business of YCST. Moreover, the conduct of Silverstein was authorized by or subsequently acquiesced in by partners of YCST.

222.     YCST took a direct financial interest in the conspiracy by acquiring an option to own equity in JTR; permitted and endorsed the ownership of its partner, Silverstein, in JTR; allowed its attorneys, staff and facilities to prepare documents, including the formation of JTR, P&B Finance and J&S Keys, for the purpose of perpetuating the fraud and to misappropriate the

61

assets that secured the MOU and Plaintiffs' Note; formulated and approved the bad faith litigation strategy to stonewall any inspection of the stones and hide the laboratory test results showing modern chemical enhancements; and used its attorneys and staff to draft and file false affidavits and other documents with the courts.

223.   YCST is vicariously liable for the conduct of Silverstein and for any and all damages proximately caused thereby.

224.   By reason of the foregoing, Plaintiffs request that this Court enter a judgment for damages in the amount of at least $10.2 million, which represents the trebled amount of the compensatory damages of not less than $3.4 million sustained by Plaintiffs, against Defendants, jointly and severally, plus the costs of suit and reasonable attorneys' fees, with interest thereon, pursuant to Chapter 772 Fla. Stat.

## COUNT IV
### (Negligent Misrepresentation)

225.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 above.

226.   Defendants failed to use reasonable care when they made representations to Plaintiffs regarding the discovery, origin, value, quantity, quality, provenance, and existence of the emeralds, the emerald site, the treasure map, the salvage and recovery of the stones, and the expenses and costs associated therewith.

227.   Upon information and belief, these representations and/ or omissions were false or misleading and were made with reckless and/or negligent disregard of their truth or falsity.

228.   Plaintiffs relied upon Defendants' misrepresentations and/or omissions to their detriment.

Active 22633414v2

229.     Plaintiffs' reliance upon Defendants' misrepresentations and/or omissions was justifiable.

230.     By reason of the foregoing, Plaintiffs have been damaged by Defendants' negligent misrepresentations and/or omissions in an amount to be proven at trial, but believed to be in excess of $3.4 million.

## COUNT V
## (Federal RICO, 18 U.S.C. §1962(c))

231.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 above.

232.     Plaintiff AZALP and its assignors are corporate entities and natural persons, and as such are "persons" within the meaning of 18 U.S.C. §1961(3).

233.     Defendants are corporate entities and natural persons, and as such are "persons" within the meaning of 18 U.S.C. §1961(3).

### The Enterprise

234.     JTR,  separately and in combination with Emerald Reef, Miscovich, Tobia, Scott Miscovich, Elchlepp, Heimdahl, Silverstein, YCST, Sullivan and P&B Finance, constituted an enterprise within the meaning of 18 U.S.C. §1961(4) (the "Enterprise"). Each and every Defendant was associated with the Enterprise.

235.     The purpose of the Enterprise was to induce potential investors and lenders to contribute funds and services by means of false and fraudulent representations regarding an alleged discovery of valuable gemstones in the Gulf of Mexico. A further purpose of the Enterprise was to steal Plaintiffs' interest in the MOU settlement, and to perpetuate and conceal the scheme through litigation, perjury, obstruction of justice, and threats and intimidation to silence those who questioned the truth of the claims made by the Miscovich Group.

236.   This was accomplished by the Miscovich Group acquiring low-grade stones, concocting an elaborate back story concerning their "discovery," and fabricating the value of the stones; the Miscovich Group inducing investors, like the Plaintiffs, to contribute loans and capital; by Silverstein and YCST forming various entities to carry out the scheme and deprive Plaintiffs of the value of their investments; and by Silverstein, YCST, Sullivan and P&B Finance filing false claims, perpetuating false testimony, concealing evidence of fraud, threatening witnesses and taking actions designed to further the fraud and to prevent inquiry or disclosure of facts which might reveal the truth.

237.   The relationships among the members of the Enterprise were longstanding and ongoing. The Miscovich Group formulated the scheme in early 2010, if not before, and continued until JTR's Florida counsel admitted to the fraud in January 2014. Emerald Reef was formed in 2010, and JTR was formed in 2011. Silverstein and his firm were first engaged by Miscovich and JTR in January 2011. The Enterprise was engaged in activities that affected interstate commerce for approximately four years.

238.   Emerald Reef and JTR were created as vehicles to raise funds from investors and to deprive Plaintiffs of their money, then to misappropriate Plaintiffs' interest in their investment; and finally, to perpetuate the fraud through the judicial system.

239.   Silverstein and YCST orchestrated the creation of JTR and J&S Keys and used those entities to divert assets and thereby deprive Plaintiffs of the benefits of the MOU settlement, Plaintiffs' security interests and the Note. In addition, Silverstein and Sullivan, through P&B Finance, acquired an equity interest in JTR, and YCST acquired a contingent equity interest. As JTR's general counsel, Silverstein and YCST managed and supervised the scheme to use litigation for the purpose of perpetuating the fraud through false claims, false testimony, by threatening

witnesses, counsel and others, and by causing Plaintiffs and others to incur enormous litigation and investigation costs.

### Pattern of Racketeering Activity

240.     Defendants, individually and as part of the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

241.     Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false and fraudulent pretenses and representations. Each Defendants' participation was critical to the racketeering scheme. They enabled, conducted, and maintained the racketeering scheme by:

    a.    Making false and deceptive statements regarding the discovery, origin, value, quantity, quality, provenance and existence of the emeralds, the emerald site, the treasure map, the salvage and recovery of the stones, and the expenses and costs associated therewith.

    b.    Through false statements regarding the origin and value of the stones, and concealment of Defendants' intent to strip away the assets of Emerald Reef, inducing Plaintiffs to accept a $5 million promissory note and provide releases to Miscovich, Scott Miscovich and Elchlepp.

    c.    Concealing and failing to disclose the creation of JTR and J&S Keys to Plaintiffs and the Court, and using those entities to defraud Plaintiffs of their rights and interests under the MOU.

    d.    Filing or causing to be filed false claims and affidavits with the Courts alleging, *inter alia*, that Miscovich and Elchlepp had made an amazing discovery of precious stones having potentially enormous value.

    e.    Filing false and misleading affidavits and other documents in the Delaware and Florida courts.

    f.    Attempting to obstruct justice by, *inter alia*, filing false claims, threatening potential witnesses, filing false declarations, and suborning perjury.

    g.    Providing assistance to the Miscovich Group after the commission of the original fraud in order to prevent their apprehension and punishment.

242.     Defendants, acting individually and as part of the Enterprise, have used the mails and wires and have caused mails and wires to be used, or reasonably knew that the mails and wires would be used, in furtherance of their fraudulent scheme, specifically:

a.     Using the interstate wire and mails, Defendants caused to be filed with the Delaware Court affidavits and correspondence which made false and fraudulent misrepresentations regarding the emeralds and their alleged discovery, provenance and value, and falsely accused Plaintiffs of various crimes and misconduct.

b.     Using the interstate wires and mails, Silverstein and YCST, at the direction of Miscovich, formed JTR (on August 11, 2011), J&S Keys (on June 27, 2011) and P&B Finance (on July 27, 2011).

c.     Using the interstate wires and mails, Defendants secretly stripped away the rights and assets to which that Plaintiffs were entitled under the MOU, delivered a Note to Plaintiffs that was virtually worthless, and sought Court approval of the MOU without disclosing material facts to the Court and Plaintiffs concerning the formation of JTR and Defendants' acquisition of financial interests in Miscovich's scheme.

d.     Using the interstate wires and mails, Defendants prepared and filed a false and fraudulent *in rem* action on behalf of JTR, verified by Miscovich, with the United States District Court for the Southern District of Florida on September 9, 2011.

e.     Using the interstate wires and mails, Defendants made numerous false and misleading filings with the Delaware Chancery Court  and Florida Federal Court, including: (i) the Affidavit of Silverstein dated October 9, 2012; (ii) the Affidavit of Jay Miscovich dated January 29, 2011 (filed in Delaware), (iii) the Verified Complaint for Maritime Salvage filed on September 6, 2011, (iv) the Second Status Report filed January 6, 2012, and (v) virtually every other pleading filed in the admiralty case pending in the Southern District of Florida.

f.     Using the interstate wires, Silverstein transmitted emails on November 11, 24, and 26, 2012, and December 12, 2012 in which he threatened Ash and Buster White, Motivation's attorney, in order to prevent them from participating in the trial commencing on December 2, 2012.

g.     Using the interstate wires, Defendants suppressed and concealed, from the Court and Plaintiffs, the results of the laboratory tests which disclosed that the emeralds were treated with modern epoxy resins and therefore could not possibly have come from an ancient shipwreck or, for that matter, remained underwater for any appreciable length of time.

66

h.     Using the interstate wires, Silverstein repeatedly threatened witnesses (*e.g.*, Neil Ash, Dean Barr, Robert Baer, Manuel Marcial, Kenneth Rose and Joe Sweeney) if they testified adversely to JTR and Miscovich.

i.     Using the interstate wires, including an email dated February 5, 2012, Silverstein instructed the attorneys representing Miscovich not to disclose the test results to the Court, Motivation and the Plaintiffs.

j.     Using the interstate wires, Silverstein threatened Daniel McAllister and Greg Stemm if they disclosed the test results.

k.     Using the interstate wires, on or about August 22, 2012, Silverstein threatened to sue Horan if he disclosed the test results and/or disclosed the reasons for his resignation as attorney for JTR.

l.     Using the interstate wires and mails, Defendants filed false and misleading Status Reports with the Florida Federal District Court.

243.     Each use of the wires and mails has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiffs by means of false pretenses and representations.

244.     The Defendants had specific knowledge that the mails and wires were being used in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used, because most communications were by email, and virtually all court filings required use of email or U.S. mails.

245.     Each of the hundreds of uses of the mails and wires in connection with the scheme to defraud, spanning a period of four years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. §§1341 and 1343, and thus is also a predicate act.

246.     Defendants' conduct also constitutes numerous individual acts of racketeering activity as defined in 18 U.S.C. §1961, including 18 U.S.C. §§1001 (false statements), 1503, 1510, and 1511 (Obstruction of Justice) and 18 U.S.C. §§1512 and 1513 (Witness Tampering and Threatening).

Active 22633414v2

247.     Defendants' acts of mail fraud, wire fraud, obstruction of justice and witness tampering, taken together, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§1961 and 1962.

248.     In connection with Defendants' scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute and on hundreds of occasions over a substantial period of time within ten years of each other.

### Relationship of Pattern of Racketeering Activity to the Enterprise

249.     The goal of the Enterprise was to extract money from investors and lenders, conceal and perpetuate the fraud, retain the funds fraudulently obtained from Plaintiffs, inflate the perceived value of the emeralds by means of false filings and claims in the courts, to cause Plaintiffs and others to incur enormous litigation and investigation costs and to thwart and intimidate anyone who questioned Miscovich's story.

250.     The pattern of racketeering activity described above was integral to the scheme. Without engaging in wire and mail fraud, obstruction of justice and witness tampering, Defendants and their associates would have been unable to obtain Plaintiffs' funds, thwart Plaintiffs' efforts to discover the truth and defraud the Courts.

251.     Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each Defendant has violated 18 U.S.C. §1962(c).

252.     As a direct and proximate result of the RICO violations described in this Complaint, Plaintiffs have suffered substantial injuries. Defendants' actions have caused Plaintiffs to lose money invested with Defendants' venture, relinquish claims through fraudulent settlements, accept worthless promissory notes and to expend large sums on litigation and investigations in an

68

effort to recover their funds, protect their interests and expose the truth.  These losses constitute injuries to Plaintiffs' property within the meaning of 18 U.S.C. §1964.

253.     For the violations of 18 U.S.C. §1962 described above, Plaintiffs are entitled to a judgment for damages in the amount of at least $10.2 million, which represents the trebled amount of the compensatory damages of not less than $3.4 million sustained by Plaintiffs, against Defendants, jointly and severally, plus the costs of suit and reasonable attorneys' fees, with interest thereon.

## COUNT VI
### (RICO Conspiracy, 18 U.S.C. §1962 (d))

254.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 and 245 through 266 above.

255.     In violation of 18 U.S.C. §1962(d), Defendants and others conspired to violate the provisions of 18 U.S.C. §1962(c) in that they knowingly agreed and conspired to conduct or participate in, directly or indirectly, the affairs of the Enterprise through the pattern of racketeering activity described above.

256.     As part of, and in furtherance of the conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that these acts were in furtherance of the pattern of racketeering activity.  As part of and in furtherance of the conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.

257.     Plaintiffs' property interests have been injured by, and as a direct and proximate result of, Defendants' violations of 18 U.S.C. §1962(d).

258.     For the violations of 18 U.S.C. §1962(d) described above, Plaintiffs are entitled to a judgment for damages in the amount of at least $10.2 million, which represents the trebled

amount of the compensatory damages of not less than $3.4 million sustained by Plaintiffs, against Defendants, jointly and severally, plus the costs of suit and reasonable attorneys' fees, with interest thereon.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1.    On Counts I and II, actual and/or compensatory damages in an amount to be proven at trial, but believed to be in excess of $3.4 million, plus punitive damages as allowed by law;

2.    On Count III, treble damages, costs and attorneys' fees;

3.    On Count IV, a judgment declaring that the releases of Defendants set forth in the MOU are null, void and of no force and effect;

4.    On Count V, actual and/or compensatory damages in an amount to be proven at trial, but believed to be in excess of $3.4 million;

5.    On Counts VI and VII, treble damages, costs and attorneys' fees; and

6.    Such other and further relief as this Court may deem just and proper.

Dated: October 3, 2014

/s/ A. Eugene Lewis
A. EUGENE LEWIS
Florida Bar Member 94810

s/ Marlow V. White
MARLOW V. WHITE
Florida Bar Member 275417
LEWIS & WHITE, P.L.C.
P.O. Box 1050
Tallahassee, Florida 32302
Vox: (850) 425-5000
Facsimile:  (850) 425-5004
Email:  lawlaw@polaris.net

Active 22633414v2

and


STEPHEN G. RINEHART
(*pro hac vice pending*)
TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone:  (212) 704-6305
Facsimile:  (212) 704-5957
Email:  stephen.rinehart@troutmansanders.com

JOHN E. HOLLOWAY
(*pro hac vice pending*)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone:  (757) 687-7724
Facsimile:  (757) 687-1557
Email:  john.holloway@troutmansanders.com

*Attorneys for Plaintiff AZALP LLC*

Active 22633414v2